**In re FOLDING CARTON
ANTITRUST LITIGATION.**

**No. MDL–250.**

United States District Court,
N.D. Illinois, E.D.

May 24, 1988.

Linda Wawzenski, Asst. U.S. Atty., U.S. Dept. of Justice, Chicago, Ill., for U.S.

Thomas J. Boodell, Jeanne B. Blumenthal, Keck Mahin & Cate, Chicago, Ill., for Folding Carton Admin. Committee.

Lowell E. Sachnoff, M. Marshall Seeder, Sachnoff Weaver & Rubenstein, Ltd., Chicago, Ill., for certain plaintiffs and Class Members to Motions of U.S. to Intervene and to Vacate Settlement.

## MEMORANDUM OPINION

WILL, District Judge.

This multi-district case arose out of massive criminal and civil antitrust litigation involving a nationwide price-fixing conspiracy among manufacturers of folding cartons in violation of the Sherman Act, 15 U.S.C. § 1. In September 1979, the parties and the court approved what was then the largest antitrust class action settlement in history. The case is currently before us on two motions of the United States: a motion to intervene pursuant to Rule 24 of the Federal Rules of Civil Procedure, and a motion to vacate a second settlement agreement entered into and approved in March 1985. For the reasons stated below, we deny the motions.

### I.

The unique facts surrounding the initial settlement agreement and the litigation that preceded it have been exhaustively detailed in *sub nom In re Folding Carton Antitrust Litigation*, 557 F.Supp. 1091 (N.D.Ill.1983), and *In re Folding Carton Antitrust Litigation*, 84 F.R.D. 245 (N.D. Ill.1979). Accordingly, we will recite only those facts necessary to a determination of the two motions now pending before us.

Over the period of more than a year prior to September 17, 1979, the parties to this action entered into settlement agreements under which various defendant manufacturers of folding cartons agreed to pay approximately $200,000,000 into a settlement fund which was deposited in an escrow account and invested. We retained jurisdiction in order to supervise the investment of the fund and its distribution.

After approval of the settlement, we appointed a "Folding Carton Administration Committee," ("the Committee") composed of two counsel for the plaintiff class, and an independent third counsel. A fourth member, Alexander Domanskis, was added later. The Committee was to review all fee applications and recommend reasonable fees to be allowed the more than fifty plaintiff law firms from coast to coast who had participated under the leadership and direction of the plaintiffs' steering committee in the comprehensive discovery as to liability and damages, an almost infinite number of motions, interlocutory appeals, etc. which were inevitable in the development of the case. After intensive investigation, including a number of hearings, the Committee recommended payment of fees aggregating some $13,000,000, almost $4,000,000 less than requested by the various firms and less than 7 percent of the settlement. We held a hearing on objections to the Committee's recommendations after which we approved the recommended fees. None of the more than fifty firms appealed even though fees of less than 7 percent of the aggregate recovery were the smallest in any major antitrust case to that time.

The Committee had performed so well on the fee claims that we asked its members to handle the plaintiff class members claims and to "report to the Court on the status of any claims filed and submit for the Court's consideration any other proposals for administration and distribution of the funds."

After the filing period was extended several times in 1980, 1981, and 1982, the Committee located and we paid additional late claimants. The Committee, again made intensive reviews and conducted many hearings as to these late claims. On their recommendation, in 1980–82 after further review and hearings, we approved 75 late claims. By 1983, the Committee had processed and we had approved over 2,600 claims totaling approximately $206,000,000. In addition, more than $13,000,000 in plaintiffs' counsel fees was paid. After deducting the Committee's distribution and administration expenses, approximately $6,000,000 still remained in the reserve fund because of the extremely favorable interest income earned by the fund from 1979 to 1983. We then directed the Committee to explore solutions relating to the disposition of the unclaimed residue of the reserve fund. Pursuant to this directive, the Committee recommended that the remainder of the fund be used to pay any other claimants who might be discovered, even though there had been several previ-

ous extensions of claims filing deadlines and extraordinary efforts had been made to get notice to all possible claimants. The Committee recommended that any funds thereafter remaining be used to establish a non-profit "Antitrust Development and Research Foundation." At that point, six of the more than 2,600 members of the plaintiff class and two settling defendants moved to have any remaining monies distributed to either former class members and/or settling defendants.

After a hearing, we denied these motions on the grounds that neither the plaintiff class members who had previously received some 176% of their single damages with notice that, as provided by the approved settlement agreement, no further amounts would be paid to them nor the defendants who had explicitly relinquished any claim to any residue in the settlement fund had any legal right to the remainder of the reserve fund. We held that, following one last effort to locate and compensate previously non-claiming class members, any reserve funds remaining were to be

> utilized for research into possible techniques for maximizing competition and preventing or detecting and stopping violations of the antitrust laws or other anticompetitive activity.

*In re Folding Carton Antitrust Litigation,* 557 F.Supp. 1091, 1094 (N.D.Ill.1983).

Thereafter, several members of the plaintiff class and defendants appealed this decision to the Seventh Circuit. On September 5, 1984, the court of appeals in an opinion written by Judge Cummings, affirmed in part and reversed in part. *In re Folding Carton Antitrust Litigation,* 744 F.2d 1252 (7th Cir.1984). The court of appeals affirmed our holdings (1) that neither the plaintiff class members nor the settling defendants had any remaining legal right to the reserve fund, (2) that heretofore non-claiming class members had the superior equitable claim, and (3) that it was therefore a proper exercise of the district court's equitable discretion to hold the fund open for an additional year to pay late claims and administrative expenses. *Id.* at 1254.

The court of appeals, however, reversed our *cy pres* decision to establish an antitrust research foundation with any unclaimed residue of the reserve fund remaining at the end of the year. The court of appeals called our decision regarding such a research foundation "a miscarriage of justice and an abuse of discretion," 744 F.2d at 1255, and it termed the foundation an "inappropriate waste of money" that amounted to "carrying coals to Newcastle." *Id.* at 1259, 1254. The Seventh Circuit, although approving most of our holding, vacated that portion of our order relating to possibly establishing such a foundation.

Instead of remanding the case for further action consistent with its opinion, the court of appeals then went on to direct that the reserve fund be held open for the one year grace filing period, that during this year the fund be used to pay so-called late, late claiming class members and appropriate expenses, and that thereafter the remainder, if any, "escheat" to the federal government in accordance with its understanding of the "spirit" and "subject to the conditions expressed in 28 U.S.C. §§ 2041 and 2042." *Id.* at 1260, 1256.[1] This was a disposition which none of the parties (plaintiffs or defendants) had requested or desired, on which there had been no hearing and no opportunity to object and which the court of appeals had given no indication it

---

1. 28 U.S.C. § 2041 provides:

   All moneys paid into any court of the United States, or received by the officers thereof, in any case pending or adjudicated in such court, shall be forthwith deposited with the Treasurer of the United States or a designated depositary, in the name and to the credit of such court.

   Section 2042 provides in relevant part:

   In every case in which the right to withdraw money deposited in court … has been adjudicated or is not in dispute and such money has remained so deposited for at least five years unclaimed by the person entitled thereto, such court shall cause such money to be deposited in the Treasury in the name and to the credit of the United States. Any claimant entitled to such money may, on petition to the court and upon notice to the United States Attorney and full proof of the right thereto, obtain an order directing payment to him.

was even contemplating prior to its decision.

In light of three subsequent statements by the Seventh Circuit, the "escheat" directive was to prove a source of confusion over the import of the appeals court decision. The first of these statements was the Seventh Circuit's acknowledgement that "the open-ended closing sentence" of § 2042 would allow " 'Any claimant entitled' thereto to recover from the United States after the escheat." *Id.* at 1255. The opinion noted secondly that, as a practical matter, it was "doubtful" that any non-claiming class members would probably ever present themselves. *Id.* Finally, in order to avoid what "would probably constitute an advisory opinion," the Seventh Circuit declined to say whether, under its approach, the government had actually obtained "title" to any money which might remain in the fund a year or more hence after the late, late claims were paid. *Id.* at 1260.[2]

The Seventh Circuit's decision thus appeared to project a possible federal interest in the reserve fund without either holding that the government had any present interest in the fund or making the government a party-plaintiff in the multi-district litigation. The appeal court's application of sections 2041 and 2042 did not and could not create a true escheat to the federal government for several reasons: first, the court determined that the language of section 2042 would permit legitimate future claimants to be paid their rightful claims (although, the opinion also seemed to suggest that after the expiration of one year, no class members (early or late) would be entitled to be claimants under § 2042); second,

the court's refusal to issue an advisory opinion on the government's title to any unclaimed funds; and third, the fact that §§ 2041 and 2042 do not provide for escheat to the federal government but only for holding the funds in the Treasury for the benefit of possible future claimants. Thus, the upshot of the Seventh Circuit's holding was that, if after one year any unclaimed funds should remain, they would be permanently available in the United States Treasury for any rightful owners who might appear.

Following the Seventh Circuit's decision, the parties filed petitions for rehearing; the court of appeals denied these petitions on October 18, 1984 without clarifying the difficulties regarding any possible future unclaimed funds.

Thereafter, on December 17, 1984, Thomas J. Boodell, a member of the Committee, telephoned Gregory C. Jones, who was at that time First Assistant U.S. Attorney in Chicago.[3] Boodell advised Jones of the government's possible future custodial interest in the reserve fund and of the Committee's desire to discuss a possible resolution of the litigation. The following day, Boodell sent a letter to Jones confirming their earlier phone conversation; Boodell also provided Jones with copies of both the district court's and the court of appeals' opinions in the case.

Following the Seventh Circuit's denial of the petition for rehearing, various petitions were filed with the Seventh Circuit and the Supreme Court. On January 8, 1985, Judges Robson and Will filed a petition for an original writ of mandamus with the United States Supreme Court or in the alternative, for a writ of certiorari.[4] Service

---

**2.** Judge Flaum dissented in part from the court's ruling on the ground that that there was no such concept as "federal escheat." *Id.* at 1256.

**3.** Jones, subsequently on February 1, 1985, upon Dan Webb's resignation, was appointed the Acting United States Attorney and served in that capacity through April 28, 1985.

**4.** In the mandamus petition, the Judges sought to have the Supreme Court direct the Seventh Circuit to (1) vacate that part of their September 5, 1984 judgment which ordered that any

amounts remaining in the Folding Carton Antitrust Litigation class action reserve fund, after the payment of late claims and administrative expenses, "escheat" to the United States; and (2) remand the issue of how the residue of the reserve fund should ultimately be distributed.

In the alternative, the Judges requested the issuance of a writ of certiorari to the Seventh Circuit to review the judgment entered September 5, 1984, and requested the Supreme Court to reverse the disposition made there of the reserve fund and to remand the issue to the district court.

of the petition was made on Judges Cummings, Eschbach, and Flaum, and also on Dan Webb, who was then the United States Attorney for the Northern District of Illinois. Several weeks later, certain former plaintiff class members also filed with the Supreme Court their own petitions for certiorari, and two defendants filed with the Court a short response to all of the pending petitions. Subsequently, the former class members sought and were granted by the Supreme Court an extension of time to file responses to the Judges' petition on the grounds that they had been busy preparing their own petition and that settlement negotiations were underway. The various petitions received a substantial amount of publicity with articles appearing in both the *Chicago Tribune* on January 15, 1985, and the *National Law Journal* on February 4, 1985.

In February 1985, Thomas Boodell again called Gregory Jones, then the Acting U.S. Attorney, to inform him that certain parties in the litigation were discussing a stipulated settlement which might affect the government's possible future interest in the fund. Boodell advised Jones that the U.S. Attorney's Office would be given notice and an opportunity to object to the proposed settlement in the event a stipulated settlement order was submitted to the court for its approval. At about this time, Lowell Sachnoff, an attorney for the Folding Carton plaintiff class, made a similar call to James T. Hynes, Chief of the Civil Division of the U.S. Attorney's office. Sachnoff also sent the U.S. Attorney's office a copy of the proposed stipulated order of settlement which the parties were to present to the court for approval at a hearing scheduled for March 21, 1985.

At the March 21st hearing, neither Hynes, nor Gregory Jones, nor anyone else from the U.S. Attorney's office appeared. After noting the government's absence, we inquired first, whether the government had been notified of the hearing, and second, what position the government was taking

on the proposed stipulated settlement order. Mr. Sachnoff responded that the government had been notified of the hearing and that he would again contact the U.S. Attorney's office to discuss the proposed settlement. We said that we would not consider the settlement which we did not favor unless the government's position was clear. We then continued the hearing until March 27, 1985.

Thereafter, on March 26, 1985, Mr. Sachnoff met Mr. Hynes in the latter's office. They discussed the proposed stipulated order of settlement, the government's position with regard to the fund, and the hearing that was to take place the following day to allow those who might be affected by the proposed order to express their views. During this meeting, Mr. Hynes reportedly told Mr. Sachnoff that the government had received notice of the stipulated order of settlement, that the government had thoroughly considered the matter and would not object to the proposed settlement order. Finally, Hynes said that neither he nor anyone else from the U.S. Attorney's office would appear at the March 27, 1985 hearing.[5]

At the March 27th hearing, no representative from the U.S. Attorney's office appeared. Mr. Sachnoff reported to the court the gist of his conversation with Mr. Hynes the day before. Specifically, Sachnoff reported that Hynes had told him that the government had no objection to the proposed settlement and would not appear. The following day, March 28, 1985, we reluctantly entered the stipulated order of settlement which provided, *inter alia*, that the remaining funds would be paid to late claimants and to the Committee for the costs of administration and attorneys' fees, that half of any funds remaining would be distributed *pro rata* to previously paid claimants, and that the other half would be paid to two or more Chicago law schools to fund research projects in the area of class actions, and particularly antitrust law.

5. *See* Lowell Sachnoff's letter to Thomas Boodell dated April 5, 1985 and attached memo of his meeting with James Hynes, Chief of the Civil Division of the U.S. Attorney's Office in Chicago, Appendix of Exhibits to Response by Folding Carton Administration Committee to United States Motion to Intervene and Vacate Settlement, # 10.

Upon entry of that order, and with the agreement of all parties, all pending petitions in the Supreme Court were dismissed by stipulation and Judges Robson and Will withdrew their certiorari and mandamus petitions.

After we entered the settlement order, notices to nonclaiming class members were published. Thereafter certain late claims were filed. The Committee reviewed the late claims, held hearings, and on March 30, 1986, filed recommendations with the court. The court held hearings and entered orders approving payment of these late claims on September 29, 1986.

After we approved on September 29, 1986, the payment of some $3,132,000 in additional late claims to 82 so-called late, late claimants and after the payment of costs and attorneys' fees incurred in connection with the earlier appeal and in processing the late claims, approximately $3.6 million dollars remained in the reserve fund. Pursuant to the terms of the settlement agreement, the fund was then divided into two equal parts: one part was distributed *pro rata* to all class members, including late claimants, who had previously received payments on their claims, some 2,700 individual payees. The other part was to be held for distribution to local law schools which were to submit applications for grants from the fund.

Following notification of the available funds, all six Chicago law schools submitted applications for grants. We reviewed the proposals and subsequently entered two orders directing that funds be paid to two law schools: a $1.2 million grant to Loyola University; and a $156,000 grant to the University of Chicago. The grant to Loyola was to establish a Center for Antitrust Law in the Public Interest, to study the working of our private enterprise economy and the role, if any, which antitrust law should play in maximizing competition in the public interest. The grant to the University of Chicago was to enable a study to be made under the direction of the country's foremost expert on the American jury, Professor Hans Zeisel, of the per-

formance of juries in complex, including antitrust, cases. The grant to Loyola was paid and the funds deposited in a University Special Account. Implementation of the two funded proposals was stayed, however, due to a *qui tam* complaint filed in this district on February 11, 1987, for damages under the False Claims Act, 31 U.S.C. § 3729 ("the Act"). The complaint was filed against the Committee, its members, their respective law firms, certain other law firms, and the various counsel who signed the settlement order which we approved on March 28, 1985. *United States Government, ex. rel., Paul Houck v. Folding Carton Administration Committee, et al.,* No. 87 C 1253.

The complaint was filed by Paul Houck, an individual who had represented late claimants in recovering money from the settlement fund during the course of the litigation. As the statute provides, he brought the action solely on behalf of the government and not individually or as a representative of any identified class of claimants but sought compensation for his services under § 3730(d) of the False Claims Act. The gist of Houck's complaint was that the Committee and its individual members as well as the individuals and entities to whom money was distributed knew that the Seventh Circuit's opinion prohibited the distribution of the fund in the manner set forth in the settlement agreement, and that they nevertheless proceeded to distribute the funds in disregard of the Seventh Circuit's mandate. Houck further alleged that the parties had misrepresented to the court that the government had waived its objections to the settlement order. The complaint was held under seal for 60 days pursuant to § 3730(b) of the Act to allow the government to decide whether or not it wished to intervene and prosecute the case. After obtaining an extension of the 60 day period, the government, on May 12, 1987, advised that it would not intervene in the *Houck* case. That case was dismissed by Judge Norgle on January 20, 1988.[6]

---

6. After the filing of the *qui tam* complaint, the United States moved to stay the March 12, 1987

On July 9, 1987, two months after advising it would not intervene in the *Houck* case, the government filed the instant motions to intervene in MDL 250 and to vacate the settlement agreement. The government now alleges that (1) the March 28, 1985 settlement order was contrary to the law of the case as set forth in the Seventh Circuit's opinion, (2) the government never technically consented to the settlement order, and (3) the instant motions were timely because the government acted promptly once it became aware of the reserve fund's actual distribution. Specifically, as to the settlement itself, the government now seeks to unscramble the previous distribution in order to recover the additional monies paid to both original and late claimants (totalling $2,313,621.09), the grants paid or designated to the two local law schools (totalling $1,356,000), attorneys' fees incurred in the formulation and execution of the settlement, and whatever remains in the reserve fund.

## II.

### A. Motion to Intervene

■ We first consider the government's motion to intervene as a matter of right under Fed.R.Civ.Pro 24(a).[7] Rule 24(a) requires that an application for intervention be "timely." Because Rule 24 leaves the timeliness criterion undefined, courts have interpreted it to require consideration of "all the circumstances" surrounding the intervention:

> Whether intervention be claimed of right or as permissive, it is at once apparent from the initial words of both Rule 24(a) and Rule 24(b), that the application must

be 'timely.' If it is untimely, intervention must be denied. Thus, the court where the action is pending must first be satisfied as to timeliness. Although the point to which the suit has progressed is one factor in the determination of timeliness, it is not solely dispositive. Timeliness is to be determined from all the cicumstances. And it is to be determined by the court in the exercise of its sound discretion; unless that discretion is abused, the court's ruling will not be disturbed on review.

*NAACP v. New York,* 413 U.S. 345, 364, 93 S.Ct. 2591, 2602, 37 L.Ed.2d 648 (1973). In this circuit, among the factors a trial court must consider in determining the timeliness of a motion to intervene are: (1) the length of time the intervenor knew or should have known of its interest in the case; (2) the extent of prejudice to the original litigating parties from the intervenor's delay; (3) the extent of prejudice to the would-be intervenor if the motion is denied; and (4) any unusual circumstances. *United States v. Kemper Money Market Fund, Inc.,* 704 F.2d 389, 391 (7th Cir.1983); *City of Bloomington, Indiana v. Westinghouse Electric Corp.,* 824 F.2d 531, 534 (7th Cir. 1987).

■ We begin by addressing the first factor: the length of time the intervenor knew or reasonably should have known of its interest before petitioning to intervene. On this point, the record is clear that as early as December 1984, the government was notified of its possible custodial or fiduciary interest in the fund, and that, following several additional notifications,

order approving the transfer of $1,200,000 from the reserve fund to Loyola which had already taken place. The motion was continued several times until the government declined to intervene in the *Houck* case. The government then, on July 9, 1987, filed the current motions in this court. On January 20, 1988, Judge Norgle granted the Committee's motion to dismiss the *Houck* case due to a lack of subject matter jurisdiction. *United States Government ex rel. Paul Houck v. Folding Carton Administration Committee, et al.,* 87 C 1253 (Jan. 20, 1988, Norgle, J.) [available on WESTLAW, 1988 WL 74829]. Houck has appealed Judge Norgle's ruling to the Seventh Circuit.

7. Fed.R.Civ.Pro. 24 states in relevant part:

(A) Intervention as of Right. Upon timely application anyone shall be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

the government specifically declined to act to intervene or otherwise act to protect any interest it might have. In an attempt to explain why it chose to remain silent during the four months preceding the entry of the settlement order (although on notice as to its terms and the date the court would hear objections to it) and for the 24 months thereafter (during which the settlement agreement was substantially carried out), the government offers the following reasons why the court should not find its petition tardy: (1) that intervention by the United States did not become "ripe" until the the the amount of money remaining in the reserve fund became "determinate"; (2) that until Paul Houck filed the February 11, 1987 *qui tam* complaint the government was unaware that money remained in the reserve fund; and (3) that within two days of the district court's order transferring $1.2 million dollars from the reserve fund to Loyola, the government notified the court as to its intentions to recover the fund.

We see little merit in any of the government's contentions. To begin with, the record amply demonstrates that the government knew long before Houck's complaint and the grant to Loyola of its possible interest in the fund and that the settlement would eliminate that interest. Indeed, the government itself does not dispute that on no fewer than seven occasions commencing in 1984, before the court approved the stipulated order of settlement, the United States Attorney's office received by letter, telephone, official notice, and face-to-face discussions, actual notice of its possible interest in the reserve fund and that it would be eliminated by the settlement agreement.[8]

Second, the fact that the government could not have known in December 1984 the precise amount of unclaimed residue which would ultimately remain in the fund is irrelevant to a determination of whether the government knew of its possible interest in the first instance. The court of appeals decision made the existence of the government's possible interest obvious, and members of the Committee and others brought this fact directly to the attention of the U.S. Attorney's office. At that stage, the only remaining question about the government's interest was a question of degree, not of kind.

Accordingly, we conclude that the timeliness clock began to run on December 17, 1984—the date the government received actual notice of its possible interest in the case and of the parties' desire to discuss it—for it was at this point the government knew that intervention might be necessary to protect *whatever* interests, custodial or beneficial, it might have in the fund.[9] Moreover, even if the government is not

---

**8.** The first notification received by the U.S. Attorney's office occurred on December 17, 1984, when Thomas Boodell telephoned First Assistant U.S. Attorney Gregory Jones to inform him of the Seventh Circuit's opinion and of the possible interest of the government created by the decision. The following day, Mr. Boodell again notified the government of its interest in the litigation, this time by letter. The government received yet a third notice on January 7, 1985, when the U.S. Attorney himself was served with a copy of the original petition for a writ of mandamus.

The fourth and fifth notifications occurred in February 1985 when both the First Assistant to the U.S. Attorney as well as the Chief of the Civil Division, James T. Hynes, received personal telephone calls advising them, first, of the tentative proposed settlement, and second, of the hearing scheduled before Judge Will on March 21, 1985, to allow interested parties to raise any objections to the proposed settlement. The sixth notification occurred when a notice of a proposed stipulated settlement order was served on James Hynes. Finally, the seventh notice came in the meeting between Mr. Sachnoff and Mr. Hynes on March 26, 1985, at which the two discussed the proposed settlement order.

Additionally, the January 15, 1985 *Chicago Tribune* "On the Law" column and the February 4, 1985 article in the *National Law Journal* on the actions of the various parties following the Seventh Circuit's decision reasonably should have put the United States on notice as to its interest in the litigation. *See Culbreath v. Dukakis,* 630 F.2d 15, 20–21 (1st Cir.1980); *NAACP v. New York, supra,* 413 U.S. at 366, 93 S.Ct. at 2603.

**9.** Perhaps even the December 17, 1984 date is overly generous. One could argue that the timeliness clock began to run on September 5, 1984, the date of the Seventh Circuit's decision creating the potential interest. *See Culbreath v. Dukakis,* 630 F.2d 15, 21 (1st Cir.1980); *Garrity v. Gallen,* 697 F.2d 452, 456 (1st Cir.1983).

deemed to have been put on notice in December 1984, it certainly was on notice in March 1985, when it received a copy of the settlement agreement which provided for the distribution of the entire reserve fund with none of it to be deposited in the United States Treasury. It also received notice of the March 27, 1985 hearing at which objections to the settlement agreement would be heard. Yet it did not file the pending motions until July 9, 1987, some 28 months later. Thus, an examination of the initial factor, the length of time the prospective intervenor knew or reasonably should have known of its interest before it petitioned to intervene (in this case, at the very least 28 months), weighs heavily against the government.

In this connection, while not material, the government's contention that it notified the court of its intention to recover the Loyola grant within two days of our approving it is factually inaccurate. We approved the grant on March 12, 1987. On several occasions thereafter, government counsel reported that consideration was being given as to what action, if any, the government would take. When, on May 12, 1987, they advised the court that the government had decided not to intervene in the Houck *qui tam* proceedings, government counsel also stated that no determination had been made as to whether or not the government would take any further action. It was not until July 9, 1987, four months after the grant, when the pending motions were filed, that the court was first aware of the government's position.

The second and third factors we must consider are (a) the extent of prejudice to the original litigating parties as a result of the would-be intervenor's failure to intervene as soon as the intervenor knew or reasonably should have known of its possible interest in the suit, and (b) the extent of prejudice to the would-be intervenor if its motion is denied. We first consider the question of prejudice to existing parties.

That the original litigating parties will be substantially harmed if the government is permitted to intervene at this late date is obvious. In March 1985, various petitions

for mandamus or certiorari were pending before the Supreme Court including those by Judges Robson and Will. While these were pending, the parties presented a proposed settlement agreement. All of the parties of record to the dispute—late claimants, previously paid claimants, and defendants agreed to the proposed settlement. In addition, the previously paid claimants agreed to withdraw their petitions for certiorari. At that time, we stated that before we would approve the settlement, we would have to know the government's position on the matter and requested that the United States be advised directly of the proposed settlement. Mr. Sachnoff then had a face-to-face meeting with Mr. Hynes, the Chief of the Civil Division of the U.S. Attorney's Office in Chicago. Mr. Hynes specifically stated that the government would not object to the proposed settlement and would not appear at the March 27th hearing at which objections were to be heard. When the United States neither appeared at the March 27, 1985 hearing to object nor filed objections or a motion to intervene in the case, and when Mr. Sachnoff reported to the court the particulars of his discussion with Mr. Hynes, we approved the stipulated settlement order.

At that March 27th hearing, we indicated that we would have preferred to proceed in the United States Supreme Court on our mandamus and certiorari petitions. In view of the agreement of all the parties of record and the fact that the government had no objection to the entry of the settlement order, we agreed to approve the settlement and withdraw the mandamus and certiorari petitions in the interest of disposing of the remaining controversies in the case. Had there been any indication that the government or any of the parties of record had any objection to the settlement, we would not have withdrawn the pending petitions in the Supreme Court and we assume the plaintiff class members would not have withdrawn theirs. After approving the settlement agreed to by all the parties, we instructed the Committee to implement the settlement, a task which was subtantially accomplished over the next two years with no objection from the government.

Given this course of events, we perceive substantial prejudice to the original parties if the government is permitted to intervene at this exceptionally late stage. *See Garrity v. Gallen*, 697 F.2d 452, 455 (1st Cir. 1983) ("The timeliness requirement was not designed to penalize prospective intervenors for failing to act promptly; rather, it insures that existing parties to the litigation are not prejudiced by the failure of would-be intervenors to act in a timely fashion."). Had the government chosen to intervene at any time prior to our approval of the settlement agreement and before the petitions pending in the Supreme Court were dismissed, which was long after it had notice of a possible interest and therefore had a right and a duty to do so, events might have turned out quite differently. But at this point, some three and one half years have elapsed, during which any opportunity to present the matter to the Supreme Court has been lost and considerable time and effort has been spent in implementing the settlement agreement which is almost completely carried out. Late claimants have been paid, some 2,700 class members have received supplemental payments, and the bulk of the remaining funds have been allocated to two law schools with the remainder to be distributed once these motions are finally disposed of.

For these reasons, attempting now to unscramble the distributions that have already taken place would be an almost impossible task and would be manifestly unfair to the original parties who relied and acted on the decisions the government made back in March 1985. *See Chase Manhattan Bank v. Corporacion Hotelera de Puerto Rico*, 516 F.2d 1047 (1st Cir.1975) (holding motion to intervene untimely where a municipality sought to intervene in a case two and one half months after judgment to assert a tax lien which would have resulted in an unscrambling of the judgment distribution); *Chemical Bank New York Trust Co. v. Steamship Westhampton*, 268 F.Supp. 169, 172–73 & n. 10 (D.Md.1967) (holding motion to intervene untimely where the United States sought to assert a claim for forfeiture against the proceeds from the forced sale of a vessel after three years of proceedings in which the government although asked, repeatedly elected not to take a position).

Yet unscrambling the earlier distribution is precisely the relief the government here seeks. Such a task would be monumental and would render worthless the hundreds of hours of effort by claimants' attorneys, accountants, the law schools, the Administration Committee and the court which were necessary to carry out the terms of the settlement. We alone spent countless hours reviewing the six law schools' grant applications, consulting with members of the Administration Commmittee, deans and other representatives of the various law schools, outside experts, etc., in determining which grants should be made. The Loyola application, for example, was revised several times after extended discussions not only with representatives of that law school but antitrust scholars throughout the country. It was finally approved many months after its original presentation after we were satisfied that, in its revised form it could make a significant contribution to the study of the U.S. economy and the maximization of competition for the public benefit.

While the University of Chicago application was less complex, it too involved considerable time and effort to put into its final form. Meanwhile, there are still pending the applications of the other four law schools which were in process of consideration and possible revision and approval on July 9, 1987 when the government filed the pending motions.

At the very least, vacation of the settlement agreement would require an attempt to recover (1) over $2,000,000 paid to almost 2,700 class members nationwide, (2) the $1,356,000 distributed and/or designated to area law schools, and (3) the various attorneys' fees, accountants' fees and other expenses incurred in the formulation and execution of the settlement agreement.

The impossibility of such a project is obvious. Many of the class member payees are undoubtedly no longer in existence. For example, a number were trustees in bankruptcy who filed claims on be-

half of debtor corporations. The amounts paid to them were then used either to pay bankruptcy administration costs or were distributed to creditors. Other payees expended the funds in various ways, by, for example, purchasing equipment, paying salaries, or paying debts and/or dividends. Funds paid to attorneys, accountants and others for their services in implementing the settlement agreement will be equally impossible to recover.

Balanced against the prejudice to the foregoing is the harm the would-be intervenor will suffer if intervention is not permitted. Though the government's brief is suprisingly silent on the question of prejudice, we believe that the government has shown at best nothing more than that it will suffer the *possibility* of insubstantial prejudice. Under the language of 28 U.S. C. §§ 2041 and 2042, the government receives unclaimed funds on deposit and holds them for possible future claimants.

■ Interestingly, the Seventh Circuit apparently did not consider the fact that the funds here involved have not and had not in 1984 been deposited unclaimed for more than five years by the person or persons entitled to them as § 2042 requires. In fact, claims were being made and paid as late as September 1986, two years after the court of appeals decision. Technically, therefore, the statutory sections in question were not and are not even now applicable. Moreover, as Judge Flaum's dissenting and concurring opinion pointed out, there is no statutory or common law basis for escheat to the federal government. Unclaimed funds generally (i.e., bank deposits, trust funds and the like) can only escheat to the appropriate state government. The federal government's possible prejudice as prospective custodian if the settlement agreement is completed will clearly be much less than the prejudice to the parties and others entitled to receive funds under the settlement if the government is permitted to interevene.

Taken in its best light, therefore, the government's case for intervention is clearly not superior to the case against it.

Where applicants can show "no more than that they will suffer the possibility of prejudice if intervention is denied; ... the balance of prejudice tips in favor of the [existing parties]. *Garrity v. Gallen*, 697 F.2d 452, 458 (1st Cir.1983). For this reason, we conclude that any possible prejudice to the government does not outweigh the substantial prejudice the existing parties will suffer if the government is permitted to intervene.

The final element in our determination of whether the government's motion to intervene is timely is whether there are "any unusual circumstances" which should be considered. *Kemper Money Market Fund, supra,* 704 F.2d at 391. "For example, if the would-be intervenor who failed to apply for intervention promptly after he became aware of his interest in the case could advance a convincing justification for his tardiness, such that for reasons other than lack of knowledge he was unable to intervene sooner, this would militate in favor of a finding that his petition was timely." *Bloomington, supra,* 824 F.2d at 537, quoting, *Stallworth v. Monsanto Co.,* 558 F.2d 257, 266 (5th Cir.1977).

Here, the government alleges that the unusual circumstance suporting its motion to intervene is that, if denied, "it is unlikely that the Seventh Circuit will ever have the opportunity to review the important issue of the propriety of the settlement agreement in light of its 1984 decision." Given the facts of this case, however, this explanation is hardly adequate. In our system, whether any court decides any question depends on whether the question is brought by a proper party. And the propriety of a party can neither be determined by the importance of the question or by the desirability of an answer by a particular court.

Moreover, a similar or comparable "unusual circumstance" exists in every intervention motion. If the party seeking to intervene is denied entry, no court, trial or appellate, will have the opportunity to pass on its contentions. This does not excuse otherwise inexcusable delay. Rather, what the government needs here is a set of special circumstances explaining its failure to act in a timely fashion. The government's

desire for a ruling by the Seventh Circuit has nothing whatever to do with "a convincing justification of tardiness." *Bloomington, supra,* 824 F.2d at 537. The Seventh Circuit's opinion was issued on September 5, 1984. The government, as a non party but one having a possible interest in the case as a result of that decision, was repeatedly notified thereafter of that possible interest as well as of the proposed settlement. Armed with this knowledge, it nevertheless specifically declined to take any steps to assert whatever interests it may have had. The only "unusual circumstance" presented by this scenerio is the fact that the government specifically declined to intervene in this case and affirmatively indicated that it had no objection to the settlement, and then two and one half years after the settlement order was entered and substantially carried out decided to file this motion. *See Western Shoshone Legal Defense and Education Ass'n v. United States,* 531 F.2d 495, 503, 209 Ct.Cl. 43 (1976) ("the law is developing a critical eye toward persons, who knowing that a pending action is designed to stabilize legal relationships that concern them, deliberately stay out of that litigation although they could easily enter it."); *United States v. Blue Chip Stamp Co.,* 272 F.Supp. 432, 436 (C.D.Cal.1967).

To sum up: In view of the fact that (1) the government failed to seek to intervene in this action until two and one half years after it was put on notice both of its possible interest and that the proposed settlement order would negate any such interest, (2) the parties of record and other beneficiaries of the settlement will be substantially prejudiced if the government is now permitted to intervene, (3) the government will suffer little prejudice, if any, if intervention is not permitted here, and (4) the extended failure to intervene is explained by no unusual circumstances, we conclude the government's motion to intervene is untimely and must be denied.

### III.

#### B. Motion to Vacate the Settlement Agreement

Having found the motion to intervene untimely under Rule 24, we could avoid consideration of the substance of the government's motion to vacate the settlement. In an effort to resolve all of the issues in this protracted case, however, we will move to a discussion of the merits.

The government claims its motion to vacate is proper under Fed.R.Civ.P. 60(b) because the district court abused its discretion by approving a settlement agreement that "violated the law of the case." *See In re Sanford Fork and Tool Co.,* 160 U.S. 247, 255, 16 S.Ct. 291, 293, 40 L.Ed. 414 (1895) ("The [lower] court is bound by the decree as the law of the case; and must carry it into execution, according to the mandate.").

Specifically, the government alleges that the settlement entered into by all parties of record and approved by us violated the Seventh Circuit's mandate (1) by allowing payment of additional funds to previously paid class members when the court of appeals had held that the plaintiff class had no rights in the reserve fund, and (2) by allowing payments to law schools for the study of antitrust law when the court of appeals had held such action to be "a miscarriage of justice and an abuse of discretion." The government further argues that (1) once the Seventh Circuit's mandate issued, the parties and the court were unalterably bound by it even insofar as any settlement was concerned, and (2) the fact that various petitions were pending in the Seventh Circuit and in the Supreme Court is irrelevant to the question of whether the parties were in fact bound by the Seventh Circuit's decision.

■ The question of whether the settlement violated the law of the case is easily answered: The settlement agreement did not violate the Seventh Circuit's mandate (1) because that mandate was not final at the time of the settlement, and (2) in any event, governed only the equitable rulings of this court. The distinction here is one between a substantive exercise of judicial power and a settlement among parties to a suit. While the appeal concerned the district court's *discretion to order* the disposi-

tion of the residual fund, the question before us in March of 1985 involved only the validity of the *parties' agreement* as to the disposition of the fund. In considering and approving the terms of the stipulated settlement agreement between the parties, a district court is not constrained by the law of the case. *See Holcomb v. United States,* 622 F.2d 937, 940 (7th Cir.1980) ("while an appellate decision establishes the 'law of the case' for all subsequent stages of the litigation ... the trial court is restrained only with respect to those issues which have been considered and resolved by the appellate court.") This obviously does not include a settlement never considered by the appellate court. Cases are frequently settled after an appeal on terms different from the appellate court's ruling. The parties are not bound to limit any settlement by the appellate court's holding and many cases are settled on terms other than the appellate court's determination, e.g., to obviate further appeals (as to the Supreme Court), or to expedite payment of damages by acceptance of a lesser amount than that mandated by the appellate court. Similarly, of course, cases are frequently settled after a trial court's judgment on terms other than those determined by the trial court, again to obviate appeals and to expedite disposition of the case.

Because the issues here were not the same, the government's reliance on *Schwartz v. NMS Industries, Inc.,* 575 F.2d 553 (5th Cir.1978) and *White v. Murtha,* 377 F.2d 428 (5th Cir.1967), is misplaced. In those cases, in contrast to this case, the respective trial judges violated the law of the case by reinterpreting the appellate courts' rulings on remand. For example, in *Schwartz,* the Fifth Circuit upheld a district court's finding that a stock issuer had breached its contract with the plaintiff stockholders; however, the appellate court determined that on remand, the district court was to reduce the plaintiffs' original award by first calculating and then deducting the market value of the nonregistered stock they could have sold. Subsequently, the appellate court found that the district court had violated the law of the case by holding on remand that the poten-

tial return on the sale of the unregistered stock ought not to mitigate damages. But in this case, the Seventh Circuit never had before it the question of the propriety of the settlement agreement. Nor had the case been remanded at the time the parties agreed to settle, for petitions for mandamus and certiorari were then pending in the Supreme Court. Thus, we could not violate the Seventh Circuit's mandate by approving the stipulated order of settlement under which the parties, in light of and in reliance upon the government's decision not to participate in the litigation, gave up their rights to pursue review of the Seventh Circuit's decision in the Supreme Court.

Moreover, as the Fifth Circuit has noted " 'the law of the case' rule is based on the salutary and sound public policy that litigation should come to an end. It is predicated on the premise that 'there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions or speculate on chances from changes in its members.' " *White v. Murtha, supra,* 377 F.2d at 431. Settlements achieve the same policy goals as the law of the case doctrine; that is, an end to litigation. And in this case, that was precisely the effect of the stipulated settlement agreement: in return for the settlement, the parties to the litigation moved to dismiss their mandamus and certiorari petitions before the Seventh Circuit and the Supreme Court thereby, they believed, bringing this protracted case to a close.

■ Even if the issues were the same, however, the law of the case doctrine is inapplicable here because the Seventh Circuit's decision lacked finality. As is clear from the record, following the Seventh Circuit's decision, the plaintiff class, and Judges Robson and Will, all sought review in the Supreme Court. Subsequent to the filing of these various petitions but before any action was taken on them, the parties to the litigation reached a settlement of the matter. Following the government's decision neither to participate in the litigation nor to object to the settlement, we merely

approved the parties stipulated order of settlement. Upon entry of that order, and with the agreement of all the parties, all certiorari petitions pending before the Supreme Court were dismissed and the mandamus petition was withdrawn.

As the preceding chronology demonstrates, the Seventh Circuit's decision lacked finality because at the time the settlement occurred, challenges to that decision were pending before the Supreme Court. Those challenges brought with them the possibility of a reversal or modification of that earlier order. And so long as the parties were awaiting action by the Supreme Court on their petitions, the Seventh Circuit's decision was not final and could not constitute an impediment to settlement. *See Airline Stewards and Stewardesses Association v. Trans World Airlines,* 630 F.2d 1164, 1167–1169 (7th Cir. 1980).

Moreover, settlements have long been favored and our approval of a settlement accepted by all the parties and not objected to by any non-party was almost perfunctory and inevitable. Having secured the consent of the government, the parties could have agreed to any settlement they chose without seeking *any* court's approval. We indicated at the time that we would have preferred to have the case considered by the Supreme Court since it involved fundamental questions of the relationship between trial and appellate courts. As we said in our petition to the Supreme Court, we believed that the Seventh Circuit's order disposing of as yet unknown funds, by a disposition which none of the parties had requested or wanted, without notice of its intention to do so, and without a hearing or opportunity to object, rather than remanding the case for future appropriate action at such time as there were funds to distribute was an abuse of appellate discretion and jurisdiction.

Of even greater importance, we believed then and continue to believe that application of § 2042 to any undistributed funds in a class action is probably error. In virtually every class action, funds remain after the final distribution to class members and the payment of all expenses. Frequently, the amount is insufficient to make a further distribution to class members economically warranted. On other occasions, as here, it results from extraordinary interest income earned on a deposited settlement fund or lower late claims and expenses than estimated.

In every such instance of which we are aware prior to this case, the court responsible for the class action has applied the *cy pres* doctrine and distributed the residue to law schools, bar foundations, public interest law agencies or similar educational or charitable organizations. To the best of our knowledge, § 2042 has never before been held applicable to such funds. As previously pointed out herein, the statute requires that they be held undistributed and unclaimed for a substantial period (5 years or more). In every class action case, the funds have been fully distributed including the *cy pres* distribution long before the statutory precondition period has run as it has not in this case.

The court of appeals holding here would effectively eliminate the *cy pres* doctrine in class actions. This would be a major change in the historical and traditional handling of such cases. Through the years, we alone, for example, have distributed residual class action settlement funds in three different class actions assigned to us to such organizations as the Chicago Bar Foundation, the Lawyers Committee for Civil Rights, etc. Other judges throughout the country have done likewise.

We believed that the question of whether the *cy pres* doctrine or § 2042 governed the distribution of residual funds in class actions, was one the United States Supreme Court should ultimately answer. In any event, we believed it inappropriate for the court of appeals *sua sponte* to do so without a hearing on the question or an opportunity for any of the parties to object or point out the relevant considerations applicable to such a major change in the long-established procedure. Accordingly, we filed our petition for an original writ of mandamus or, in the alternative, for a writ of certiorari seeking to have the case remand-

ed to us for a determination of the appropriate disposition of any residue at such future time (it turned out to be two years later), as the amount of the residue, if any, could be determined.

In the course of making such a determination, we would have heard arguments and received briefs as to which principle, *cy pres* or § 2042 governed. The court of appeals then could have reviewed our decision after further briefing and argument on the question. If necesssary, the Supreme Court could then have reviewed the court of appeals decision. It is possible, of course, that, after full consideration, we would have concluded that § 2042 controlled. It is also possible that, after similar consideration, the court of appeals might have concluded that the *cy pres* doctrine and not § 2042 was the governing principle. Whatever the court of appeals decided, its decision would have been made after an opportunity for careful consideration of the merits of the alternatives and not *sua sponte* as was done here. Unfortunately, we never had the opportunity to raise these questions with the Supreme Court. The parties advised us that they had agreed upon a settlement to which the government had no objection and we had no realistic alternative but to approve the agreed settlement and withdraw our petition to the Supreme Court. Accordingly, we reluctantly approved it.

■ To vitiate the contention that the record parties' settlement agreement was not constrained by the law of the case, the government argues that, in effect, it never validly consented to the settlement. Thus, the government contends that although a representative from the U.S. Attorney's office purported to consent to the settlement agreement in 1985, that consent was "meaningless" and a "nullity" because in 1985 individual U.S. Attorneys only had the authority to institute and/or settle claims in cases not exceeding $100,000. To support this contention, the government points to the following Department of Justice regulations, which, it claims, demonstrate that only the Deputy Attorney General had the authority to decide whether to intervene or,

alternatively, to agree not to object to the stipulated settlement order:

> ... [t]he Assistant Attorneys General of the litigating divisions are authorized, with respect to matters assigned to their divisions, to: (1) accept offers in compromise of claims on behalf of the United States in all cases in which the difference between the gross amount of the original claims and the proposed settlement does not exceed $750,000 or 10% of the original claim, whichever is greater. 28 C.F. R. § 0.160 (1985). In all cases in which the amount of the offer in proposed settlement exceeds the applicable amount specified in § 0.160, and in any case falling within any of the exceptions enumerated in § 0.160(c), the Assistant Attorney General concerned shall, if in his opinion the offer of compromise, or administrative action to settle, should be accepted, transmit his recommendation to that effect to the Deputy Attorney General.
>
> (b) The Deputy Attorney General is authorized to exercise the settlement authority of the Attorney General as to all claims on behalf of, and all claims against, the United States. 28 C.F.R. § 0.161 (1985).

It is not clear to us that the foregoing authorizes a U.S. Attorney only to settle and compromise money claims by the United States not exceeding $100,000. But we need not decide whether the government can now assert that the U.S. Attorney's decision not to intervene or object to the settlement was an unauthorized act in light of the regulation, for *this* regulation is clearly not applicable to *this* case. The interest of the government in this matter was not a *money claim* by the United States. The Seventh Circuit's opinion at best created in the government a possible future interest in a fund currently owned by others (i.e., late claimants and potential unspecified remaindermen). To put the matter slightly differently: the issue here is not whether, under 28 C.F.R. § 0.160, the U.S. Attorney had the authority to settle and compromise a money claim of the United States in excess of $100,000; the issue is whether the U.S. Attorney had the authority to take (or not to take) certain measures

which, given the Seventh Circuit's decision, might have been necessary to protect whatever interest the United States may have had in any future residue in the fund. Clearly, the answer to the latter question is that he did.

The authority of a U.S. Attorney to "prosecute or defend, for the Government, all civil action suits or proceedings in which the United States is concerned" is governed by 28 U.S.C. § 547. Under this statute, the U.S. Attorney is given broad discretion in deciding when to initiate legal proceedings. Courts, moreover, are "powerless to interfere with his discretionary power. The court cannot compel him to prosecute a claim or even an indictment." *Pugach v. Klein*, 193 F.Supp. 630, 635 (S.D.N.Y.1961).

Section 547 confers on the United States Attorney the authority to participate in a case by petitioning to intervene. *Martindell v. International Telephone and Telegraph Corp.*, 594 F.2d 291, 294 (2nd Cir.1979) (when the government's interest is at stake, the proper procedure is for the United States to file a petition to intervene pursuant to Fed.R.C.P. 24); *see also* 28 U.S.C. § 2042 (specifically placing responsibility for protecting funds deposited in the United States Treasury pursuant to that statute on the United States Attorney). In addition to § 547, Title 4 of the *United States Attorneys' Manual*, § 4–1.327 provides:

> U.S. Attorneys are *requested* to report any infringement of, or dereliction with respect to the property or other interest of the United States *warranting the institution of civil proceedings* when such matters have not been referred for handling. (Emphasis added).

The language of § 4–1.327 is discretionary, not mandatory or directive. Here, the parties and the Committee brought the issue of the possible interest of the United States (a non-party to the litigation) directly to the government's attention by contacting both the Acting U.S. Attorney and the Chief of the Civil Division of the U.S. Attorney's Office in Chicago. After the latter reviewed the proposed stipulated order of settlement, he advised that the

government did not object and would not intervene or even appear. Whether that decision was reached after consultation with his superiors in the Justice Department, or whether he took this action on his own, is both unknown and irrelevant. For under section 547, Hynes had the authority to "defend" in "all civil actions in which the United States is concerned," and the guidelines in the *Manual* gave him discretion whether to report any infringement of any interest of the United States warranting the institution of civil proceedings.

In summary, the government was given proper notice of its potential future interest in the fund and of the proposed settlement agreement which eliminated that interest. After review, Assistant United States Attorney Hynes indicated the government's intention to take no action to oppose that settlement agreement. While he may have consulted his superiors in Washington, the relevant statutes and guidelines clearly gave him the authority to make that decision. For these reasons, we cannot accept the government's contention that the settlement is invalid because no one in the U.S. Attorney's office had the authority (1) to intervene in the case to protect the government's potential future interest in the fund, or (2) to permit the case to be settled by not objecting to the stipulated order of settlement. Clearly, the U.S. Attorney's office had the power to object or to intervene. It did neither. Accordingly, we conclude that the government's arguments in support of its motion to vacate the settlement are without merit.

IV.

For the reasons discussed above, the government's motions to intervene and to vacate the settlement are denied. An appropriate order will be entered.