744 F.2d 1252
 1984-2 Trade Cases 66,189
 In re FOLDING CARTON ANTITRUST LITIGATION.
Appeals of FEDERAL PAPER BOARD COMPANY, INC.; Cumberland
Farm Dairies; Pantry Pride Enterprises, Inc.; the Mead
Corporation; Beatrice Foods Co.; Land O'Lakes, Inc.; G.
Heileman Brewing Co., Inc., and Grist Mill Co.
 Nos. 83-1467, 83-1468, 83-1506, 83-1507 and 83-1673.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 13, 1984.
Decided Sept. 5, 1984.
Rehearing Denied Oct. 10 and Oct. 18, 1984.
 
 Eugene M. Warlich, Doherty, Rumble & Butler, P.A., St. Paul, Minn., Harold F. Baker, Howrey & Simon, Washington, D.C., Dianne M. Nast, Philadelphia, Pa., for plaintiff-appellant.
 Thomas J. Boodell, Jr., Boodell, Sears, Sugrue, Giambalvo & Crowley, Chicago, Ill., for defendant-appellee.
 Before CUMMINGS, Chief Judge, and ESCHBACH and FLAUM, Circuit Judges.
 CUMMINGS, Chief Judge.
 
 
 1
 These five appeals have been consolidated and grow out of antitrust litigation involving an alleged nationwide price-fixing conspiracy among manufacturers of folding cartons in violation of the Sherman Act (15 U.S.C. Sec. 1). The appeals have been filed by two former defendants and six former class-member plaintiffs and relate chiefly to the district court's disposition of an approximately $6,000,000 reserve fund established to pay late claims and to meet various expenses and contingencies connected with the distribution of the $200,000,000 settlement fund. The litigation is fully described in the joint memorandum opinion of District Judges Robson and Will reported in 557 F.Supp. 1091 (N.D.Ill.1983).
 
 
 2
 On September 19, 1979, the district court entered a final judgment approving the settlement agreement providing for payment by the 25 defendants of $200,000,000 into a fund for distribution to the plaintiff class. Six days thereafter the court appointed the Folding Carton Administration Committee ("Administration Committee") which is also involved in these appeals. The settlement agreement provided for a cut-off date of September 6, 1979, for claims but later claims were honored with judicial assent.
 
 
 3
 On March 6, 1980, the district court approved distribution of 97% of the fund, which by then had grown to approximately $206,000,000, and decided that the balance be held in reserve for potential late claims and errors in distribution. All timely claims were paid by the Administration Committee by the end of April 1980. Some late claims were subsequently paid with court approval. Others still pend.
 
 
 4
 On September 3, 1982, the Administration Committee (composed of two counsel for the plaintiff class, one who had represented a defendant and an independent fourth) recommended that the $6,000,000 in the reserve fund plus future interest be used to establish a private "Antitrust Development and Research Foundation" to promote the study of complex litigation and various substantive and procedural aspects of antitrust law. Thereafter six former plaintiff class members[1] and two former defendants[2] filed motions in the district court, which had retained jurisdiction of the case, seeking distribution of the remainder of the settlement fund to plaintiff class members or otherwise pro rata to the settling defendants. Two of the class members[3] also requested return to class-member plaintiffs of fees and costs that had been awarded to counsel for the Administration Committee, or in the alternative that they be audited, with excessive fees and costs returned to them, and that the expenses paid to the Administration Committee's accounting firm be subjected to an independent accounting. We granted a temporary stay in April 1983 and granted a stay pending appeal on May 3, 1983, so that no more late claims have been paid[4] nor has the suggested Foundation been organized. At the same time we postponed any action on the Administration Committee's motion to dismiss the appeals.
 
 
 5
 We now hold that we have jurisdiction over this matter pursuant to the collateral order doctrine for the reasons given in In re General Motors Corporation Engine Interchange Litigation, 594 F.2d 1106, 1117-1121 (7th Cir.1979). Therefore the motion to dismiss is denied.
 
 
 6
 As to the district court's February 17, 1983, distinguished opinion, we agree that neither the plaintiff class nor the settling defendants have any right to the reserve fund. We also agree that under these circumstances, it was appropriate for the district court to consider the cy pres doctrine or Fluid Class Recovery to achieve an equitable disposition of the reserve fund. We discussed the "fluid recovery" concept in Simer v. Rios, 661 F.2d 655, 675-677 (7th Cir.1981), but refused to utilize it. As in Simer, the $200,000,000 paid by these defendants surely counsels deterrence, has disgorged illegally obtained profits and has satisfied the compensatory factor of the Sherman Act, so that fluid recovery is not needed.[5] Consequently it was inappropriate for the district court to utilize the reserve fund to establish a tax-exempt Foundation for research on complex antitrust litigation and on various substantive aspects of the antitrust laws, as suggested by the Administration Committee.
 
 
 7
 The district court directed that the funding of the Foundation should not commence until February 17, 1984, one year from the date of its opinion. That period was provided to the Administration Committee for the payment of additional late claims. 557 F.Supp. at 1110. Because of our temporary stay order of February 17, 1983, and our May 3, 1983, stay pending appeal, that beneficial one-year extension was of no effect. Therefore, the Administration Committee should hold the reserve fund available for one year from the date of this opinion to cover the cost of locating absent class members and making appropriate payments to them from the principal and accrued interest of the reserve fund.
 
 
 8
 After careful consideration, we conclude that the establishment of the proposed Foundation would be carrying coals to Newcastle. There has already been voluminous research with respect to multidistrict antitrust litigation and the substantive and procedural aspects of the antitrust laws by judges, lawyer specialists, law schools, bar associations, Congressional committees, the Department of Justice and the Federal Trade Commission, and it is a continuing project of all those concerned. In our view, establishing an unneeded Foundation for these purposes from the reserve fund would be a miscarriage of justice and an abuse of discretion. Instead, after the passage of a year hence for making appropriate payments to absent or tardy class members and for absorbing appropriate expenses, we direct that the remainder of the reserve fund escheat to the United States. The reason given by the district court for not ordering escheat to the United States government was that the federal statutory terms established in 28 U.S.C. Secs. 2041 and 2042 for escheat do not apply. However, the spirit of those statutes is certainly satisfied and indeed the technical Congressional requirements present no real obstacles.
 
 
 9
 Thus 28 U.S.C. Sec. 2041 is now entitled "Deposit of monies in pending or adjudicated cases," and the text applies to "All monies paid into any court of the United States or received by the officers thereof, in any case pending or adjudicated in such court * * *." Here the $200,000,000 fund was paid into the district court or its officers, namely, the Administration Committee, thus satisfying that portion of the escheat statute. The immediately succeeding Section initially refers to "money deposited under section 2041" and provides that money so deposited and unclaimed for five years shall be deposited in the federal Treasury "in the name and to the credit of the United States." The district court stated that it could not approve escheat to the United States because five years had not then elapsed since the deposit of the fund and the right to the money had not been adjudicated. 557 F.Supp. at 1103. But almost five years have now elapsed, and we are permitting unpaid class members to claim until a year from this opinion, which will be well beyond the unclaimed five years specified in Section 2042. Moreover, the right to the money among the parties hereto was adjudicated in the February 17, 1983, district court opinion and in 1979 when it approved the settlement agreement. In view of the generous time period afforded by the district court and us, it is doubtful that any claimants will come along thereafter. Nevertheless, the open-ended closing sentence of 28 U.S.C. Sec. 2042 will allow "Any claimant entitled" thereto to recover from the United States after the escheat. Hodgson v. Wheaton Glass Co., 446 F.2d 527 (3d Cir.1971). Accordingly, the statutory terms for federal escheat have been sufficiently satisfied.
 
 
 10
 As noted, 28 U.S.C. Sec. 2042 permits an entitled claimant to recover from the United States. To that extent, the escheat is impermanent[6] and also raises no unconstitutional taking. Since any legitimate claimant has been afforded an adequate remedy against the United States, there is no bar to interim governmental use of the escheated money "deposited in the Treasury and to the credit of the United States."[7] Because the settlement stemmed from defendants' alleged violations of Section 1 of the Sherman Act (15 U.S.C. Sec. 1), it is much more appropriate to have the escheat benefit the United States rather than to adopt the labyrinthine methodology employed by the dissent to justify escheat to the states.
 
 
 11
 Five amici curiae non-claimant members of plaintiff class[8] favor the district court's order of February 17, 1983, insofar as it gives such persons an additional year to present claims. Our resolution grants a similar grace period but of course provides for escheat thereafter instead of for the Foundation championed by amici.
 
 
 12
 The order of February 17, 1983, and the order of March 3, 1983, approving fees and costs are affirmed except with respect to the establishment of the Foundation. As to the reserve fund, we hold that any portion (including interest) remaining a year herefrom after the payment of meritorious claims and expenses by the Administration Committee shall escheat to the United States subject to the conditions expressed in 28 U.S.C. Secs. 2041 and 2042. Motion to dismiss appeals denied; costs to be borne by the respective parties.[9]
 
 
 13
 FLAUM, Circuit Judge, concurring in part and dissenting in part.
 
 
 14
 I agree that the district court abused its discretion in holding that the unclaimed portion of the settlement fund would be used to create an Antitrust Research Foundation. To the extent that the majority opinion holds that the unclaimed fund shall "escheat" and, in effect, remain permanently available in the United States Treasury to pay late claims pursuant to 28 U.S.C. Sec. 2042, I dissent. The federal government cannot escheat unclaimed property.[1] The majority avoids this by saying that the federal government may have "interim" use of the funds until claimants present themselves, while recognizing that the claimants will never present themselves. As a practical matter, the majority is allowing an escheat, and indeed, the majority refers to its result as an escheat.
 
 
 15
 I agree that nonclaiming class members should be allowed an additional year in which to file claims. During that year, any late claimants who can show good cause may, in the discretion of the district court, be paid their share of the settlement fund. After the cut-off date, any remaining funds should be deposited with the United States Treasury. I would hold that at that time, any state that can establish a right to escheat under its law may petition to escheat its share of the fund.
 
 A.
 
 16
 Where a district court's order is a product of a choice among a number of options and reflects a weighing of the equities, and an appellate court holds that the district court abused its discretion in making the particular choice that it made, the appropriate course is for the appellate court to remand the case. See, e.g., Ketchum v. Byrne, 740 F.2d 1398 at 1412-1413 (7th Cir.1984) (as amended). Here, the district court was faced with a number of possible choices, and after weighing the equities, held that the fund should be used to establish an antitrust foundation. The majority and I agree that this use was an abuse of discretion. I join in the majority's decision not to remand this case to allow the district court to dispose of the funds only because, in reaching its result, the district court clearly held that nonclaiming class members had the superior equitable right to the funds. In re Folding Carton Antitrust Litigation, 557 F.Supp. 1091, 1107 (N.D.Ill.1983). The district court thus chose among its options. I do not hold, and I do not understand the majority to hold, that this holding was an abuse of discretion. Thus, I do not preclude, and I do not understand the majority to preclude, a district court in another case from dividing unclaimed funds among claiming class members or allowing the funds to revert to the defendants.
 
 B.
 Section 2042 provides in pertinent part:
 
 17
 In every case in which the right to withdraw money deposited in court ... has been adjudicated or is not in dispute and such money has remained so deposited for at least five years unclaimed by the person entitled thereto, such court shall cause such money to be deposited in the Treasury in the name and to the credit of the United States. Any claimant entitled to any such money may, on petition to the court and upon notice to the United States attorney and full proof of the right thereto, obtain an order directing payment to him.
 
 
 18
 The majority holds that under section 2042, the money will "escheat" to the United States and remain available to pay late claimants who file. The majority notes that, as a practical matter, the class members who have not yet filed claims probably will never file. Thus, the question becomes what should happen to the money.
 
 
 19
 The United States government cannot obtain title to the money. Section 2042 operates only to change the depositary of unclaimed funds; it is not a federal escheat statute. 7 Pt. 2 Moore's Federal Practice p 67.04 (1984). It does not operate to change the ownership of the funds; even though the money is deposited "in the name and to the credit of" the United States, the United States obtains no beneficial interest in the funds but merely holds the money as trustee for the rightful owners. See United States v. Klein, 303 U.S. 276, 279-80, 58 S.Ct. 536, 537-38, 82 L.Ed. 840 (1938); Stapleton v. $2,438,110, 454 F.2d 1210, 1214-15 (3d Cir.), cert. denied, 409 U.S. 894, 93 S.Ct. 111, 34 L.Ed.2d 151 (1972); In re Moneys Deposited, 243 F.2d 443, 445 (3d Cir.1957); United States v. Cochrane, 87 F.2d 3, 4 (5th Cir.1936). Thus, there can be no permanent escheat to the United States. United States v. Seventeen Thousand, Four Hundred Dollars in Currency, 524 F.2d 1105, 1109 (10th Cir.1975) (Doyle, J., dissenting) (deposit under section 2042 does not act as escheat); Hodgson v. Wheaton Glass Co., 446 F.2d 527, 535 (3d Cir.1971); United States v. Iovenelli, 403 F.2d 468, 469 (7th Cir.1968); see Hansen v. United States, 340 F.2d 142 (8th Cir.1965). Moreover, allowing the United States to take title to the money may well be unconstitutional as depriving claimants of property without due process of law. See American Loan & Trust Co. v. Grand Rivers Co., 159 F. 775 (C.C.Ky.1908).[2] Thus, the unclaimed funds at issue here do not, and cannot, become the property of the United States. The remaining funds merely will sit in the United States Treasury. It may be, as the majority states, that an escheat to the federal government would be "appropriate." Regardless of whether such a result is appropriate, it is not authorized by law.
 
 
 20
 Because some nonclaiming class members will never come forward, and because they have the superior equitable right to the funds, the task becomes to compensate them as nearly as possible.[3] Nonclaiming class members "are at least the equitable owners of their respective shares in the recovery." Boeing Co. v. Van Gemert, 444 U.S. 472, 482, 100 S.Ct. 745, 751, 62 L.Ed.2d 676 (1980).
 
 
 21
 Traditionally, unclaimed property escheats to the states. See Hodgson v. Wheaton Glass Co., 446 F.2d at 535. A number of courts have recognized that money deposited under section 2042 may escheat to the states. See id.; see also United States v. Klein, 303 U.S. 276, 58 S.Ct. 536, 82 L.Ed. 840 (1938); Stapleton v. $2,438,110, 454 F.2d at 1214. This is true even where, as here, the unclaimed property is created under federal law. See Hodgson v. Wheaton Glass Co., 446 F.2d at 535; In re Moneys Deposited, 243 F.2d at 447. I would not preclude the states here from petitioning to escheat the fund. Unlike the federal government, a state government may escheat unclaimed property on behalf of its citizens because the state stands as parens patriae as to its citizens.[4] See Comment, Damage Distribution in Class Actions: The Cy Pres Remedy, 39 U.Chi.L.Rev. 448, 453-58 (1972). The state acts to represent those of its citizens who do not collect their unclaimed property.
 
 
 22
 The theory of allowing an escheat to the states is that nonclaiming class members will benefit indirectly to the extent that the state uses the fund to benefit all of its citizens. Obviously, this results in an imperfect fit between the class harmed--the nonclaiming class members--and the class benefitted--all citizens. However, awarding the fund to either the defendants or the claiming class members results in an even less perfect fit because it ensures that nonclaiming members will receive no benefit.
 
 
 23
 Allowing escheat to the states serves the purpose of the antitrust law, class action settlements, and the purpose of the reserve fund at issue here. First, to the extent that antitrust law serves a deterrence purpose, it is served through any plan not resulting in return of the fund to the defendants. This purpose is not as applicable where, as here, the damages are created pursuant to a settlement agreement in which the defendant admits to no wrongdoing. To the extent that the antitrust law has a compensatory rationale, escheat serves it by allowing each member of the class some degree of recovery, even if indirect. Second, this court has noted that "[t]he class action ... is primarily a device to vindicate the rights of individual class members." In re General Motors Corporation Engine Interchange Litigation, 594 F.2d 1106, 1128 n. 33 (7th Cir.1979), cert. denied, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1980). Escheat allows the rights of every class member to be vindicated in some sense. Finally, the district court stated that "the reserve fund itself was established for the express purpose of benefitting those class members who might appear and file late claims." In re Folding Carton Antitrust Litigation, 557 F.Supp. at 1107. Again, escheat is the best way to ensuring that the reserve fund will be put to an approximation of its intended use. See generally Comment, Damage Distribution, supra at 453-58.
 
 
 24
 In this case, the non-claiming class members are citizens of different states. Thus, under a parens patriae theory, no one state may escheat the entire fund. I would hold that each state may escheat a portion according to the rule announced in Texas v. New Jersey, 379 U.S. 674, 85 S.Ct. 626, 13 L.Ed.2d 596 (1965). In that case, several states invoked the original jurisdiction of the Supreme Court to determine which state was entitled to escheat money belonging to creditors, living in different states, of a corporation. The Court held that the state of each creditor's last-known address should be entitled to escheat the creditor's share. To the extent that a creditor's last-known address is in a state that does not provide for escheat of that property, the state of corporate domicile would be permitted to escheat that portion, subject to the right of the state of the last known address to recover if its law later permitted escheat. Id. at 680-82, 85 S.Ct. at 630-31. The Court based its result not on "statutory or constitutional provisions or ... past decisions nor ... logic ... [but rather] ease of administration and of equity.... We believe that the rule we adopt is the fairest, is easy to apply, and in the long run will be the most generally acceptable to all the States." Id. at 683, 85 S.Ct. at 631.
 
 
 25
 Applying the rule to the facts of this case, and guided by the principles of "ease of administration and of equity" behind the rule, I would allow each state to escheat that portion of the fund that represents its share of the number of nonclaiming class members whose last address is within its state as compared to the total number of nonfiling claimants. A list of all such addresses was compiled when the notices of the settlement were sent out to all class members. To the extent that a state's law does not permit escheat of the property, the money will remain in the Treasury, subject to escheat should the state change its law.[5]
 
 ORDER
 
 26
 The petition for rehearing our disposition of In Re: Folding Carton Antitrust Litigation is denied for the reasons set forth below.
 
 
 27
 The petition erroneously assumes that this Court substituted its equitable judgment for that of the district court. Rather, we vacated that portion of the district court's order that directed the establishment of an "Antitrust Research and Development Foundation" to be funded with the unclaimed residue of the reserve fund because such disposition of the residue was an inappropriate waste of money. We then directed that any residue from the reserve fund "escheat" to the United States pursuant to 28 U.S.C. Sec. 2042. This direction merely implements a direct Congressional mandate for the disposition of residual funds deposited with a district court.
 
 
 28
 Our statement that the disposition even satisfies the "spirit" of 28 U.S.C. Secs. 2041 and 2042 was not intended to obscure our holding that those provisions clearly mandate depositing the residue with the federal Treasury. The funds in question have been paid to an Administrative Committee, whose members are officers of the district court within the meaning of 28 U.S.C. Sec. 2041. The right to withdraw this money has been adjudicated through Judge Will's approval of the settlement. It is undisputed that the only legitimate claimants to the fund are those class members whose claims have not previously been satisfied. Consequently Section 2042 applies directly to the case before us. While that Section originally spoke of money "deposited in court," by recent amendment it now reads "deposited in court under section 2041" and therefore controls. The legislative intent to make Section 2042 govern all funds covered by Section 2041, including those "received by the officers [of the court]," is patent.
 
 
 29
 Our decision that the district court's order was an abuse of discretion need not rest solely on our belief that such antitrust research was unnecessary in the light of the tremendous past and ongoing research in that field. The district court lacked authority to commission such an academic research project and to fund it with money deposited in its registry for which no claimant could be found. While courts are encouraged to be creative in granting equitable relief, the domain of equitable remedies surely does not include philanthropic works of no conceivable or provable benefit to the parties entitled to relief.
 
 
 30
 Finally, to the extent our choice of the term "escheat" implies that we were directing how the funds may be treated or utilized once they are deposited in the Treasury, the term has appeared elsewhere (including the district court's opinion) in a federal context, and our opinion did not refer to "escheat" in the same sense as reference to escheats to the states. Since our opinion does not fashion a remedy, but merely disposes of the money pursuant to Sec. 2042, we need not decide all issues left unresolved by the statute. Questions such as whether the government obtains "title" to the money or whether a state may possess a right of escheat are beyond the scope of this controversy and their resolution would probably constitute an advisory opinion.
 
 
 31
 Without subscribing to the reasoning of this order, Judge Flaum joins in the denial of the petition for rehearing.*
 
 
 
 [1]
 Land O'Lakes, Inc., G. Heileman Brewing Co., Inc., Grist Mill Co., Beatrice Foods Co., Cumberland Farm Dairies, Inc. and Pantry Pride Enterprises, Inc
 
 
 [2]
 The Mead Corporation and Federal Paper Board Company, Inc
 
 
 [3]
 Cumberland Farm Dairies, Inc. and Pantry Pride Enterprises, Inc
 
 
 [4]
 The last distribution to late claimants was apparently on May 27, 1982
 
 
 [5]
 For a comprehensive discussion of this subject, see Developments in the Law--Class Actions, 89 Harv.L.Rev. 1318, 1516-1536 (1976); for refusal to utilize the analogous concept of creative sentencing in the criminal field, see United States v. Wright Contracting Co., 728 F.2d 648, 650-653 (4th Cir.1984), where the court of appeals overturned district court orders requiring defendants to contribute substantial sums to private charitable organizations
 
 
 [6]
 Some of the cases cited in the dissent are thus accurate in stating that the escheat to the United States is not permanent
 
 
 [7]
 The Supreme Court decision addressing state escheat cited by the dissent, Texas v. New Jersey, 379 U.S. 674, 85 S.Ct. 626, 13 L.Ed.2d 596 (1965) did not involve property in dispute under federal law and therefore the role of the United States as a depositary under 28 U.S.C. Sec. 2042 was not implicated. That case does not inject state parens patriae principles into matters solely within federal jurisdiction. Here the fund arose out of defendants' alleged violations of the federal antitrust laws. None of the cases relied upon in the dissent involves a situation comparable to the present one, so that this opinion is not in conflict with other cases involving 28 U.S.C. Secs. 2041 and 2042
 
 
 [8]
 Avery International Corp., Handschy Chemicals, Inc., John C. Gilmore, Textor Corporation and Zachary Confections, Inc
 
 
 [9]
 All arguments presented by the litigants have been fully considered. Most of them were properly rejected in the opinion below. Those not covered there or in this opinion do not merit discussion
 
 
 [1]
 It may be that the United States may forfeit funds deposited into the Treasury under section 2042 where a statute gives the government a right to assert a beneficial interest or ownership of the funds. See United States v. Iovenelli, 403 F.2d 468 (7th Cir.1968) (government may have right to money used to bribe federal agent, pursuant to 18 U.S.C. Sec. 3612); In re Escheat of Monies Deposited, 187 F.2d 131 (3d Cir.1951) (same). See also United States v. Farrell, 606 F.2d 1341, 1344-45 & n. 7 (D.C.Cir.1979) (summary of statutory forfeiture). The United States may also assert a reversionary interest in unclaimed funds where such reversion is permitted by statute. See 38 U.S.C. Sec. 3202(e) (any funds of deceased veteran derived from federal veterans' benefits paid to decedent that would escheat to state shall escheat to United States). One court has noted that although Sec. 3202(e) uses the term "escheat," the statute actually permits reversion, not escheat. In re Estate of Novotny, 446 F.Supp. 1027, 1031-35 (S.D.N.Y.1978). Here, there is no statute allowing the federal government to assert a beneficial interest in damages in a private antitrust action
 
 
 [2]
 Prior to the decision in American Loan & Trust Co., the statute did not permit claimants to petition for return of their money. Following the decision, the statute was amended to its present form. See Act of March 3, 1911, c. 224, 96 Stat. 1083. Thus, the issue of the constitutionality of a permanent escheat to the United States has not arisen since the 1911 amendment. See In re Moneys Deposited, 243 F.2d 443 (3d Cir.1957)
 
 
 [3]
 This is the purpose behind both the fluid recovery and cy pres theories. See Newberg, Class Actions Sec. 7570 (1977)
 
 
 [4]
 The theory of the state as parens patriae is used in the antitrust class action context in three distinct senses. First, it refers to the traditional power of the state to protect those of its citizens who cannot protect themselves, by collecting their unclaimed property. Second, it refers to attempts by states to extend their traditional power and sue on behalf of their citizens allegedly injured. Third, it refers to attempts by states to sue for alleged injury to the general economy of the state itself. In this case, I refer to parens patriae only in its first sense
 
 
 [5]
 Some states have a provision in their escheat statute permitting the owner of the property to reclaim the property after escheat. See Uniform Disposition of Unclaimed Property Act Sec. 19; see, e.g., Ill.Rev.Stat. ch. 141, Sec. 119
 
 
 *
 No judge in active service requested a vote on the suggestion for a rehearing en banc. However, Judge Richard A. Posner did not participate in the consideration or decision of the matter