Paul HOUCK, on Behalf of the UNITED STATES of America, Plaintiff–Appellant,

v.

FOLDING CARTON ADMINISTRATION COMMITTEE, et al., Defendants–Appellees.

In re FOLDING CARTON ANTITRUST LITIGATION.

Appeal of UNITED STATES of America.

Nos. 88–1314, 88–2438.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1988.

Reargued April 12, 1989.

Decided Aug. 9, 1989.

As Amended on Denial of Rehearing and Rehearing In Banc Sept. 15, 1989.

---

Linda A. Wawzenski, Asst. U.S. Atty., John D. Brennan, Chicago, Ill., Barry G. Reed, Zimmerman & Reed, Minneapolis, Minn., for plaintiff-appellant.

Stephen R. Swofford, Nancy G. Lischer, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Lowell E. Sachnoff, Sachnoff, Weaver & Rubenstein, Thomas R. Meites, Michael M. Mulder, Joan H. Burger, Meites, Frackman & Mulder, Thomas P. Luning, Schiff, Hardin & Waite, William A. Montgomery, Schiff, Hardin & Waite, Marshall M. Seeder, Sachnoff & Weaver, Chicago, Ill., Kevin M. Forde, Mary Anne Mason, William H. Oswald, Julian C. Campbell, Jr., Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Perry Goldberg, Specks & Goldberg, Alexander R. Domanskis, Brown & Domanskis, James B. Sloan, Pedersen & Houpt, Chicago, Ill., Alan Wiseman, Howrey & Simon, Douglas V. Rigler, Kaplan, Russin & Vecchi, Washington, D.C., Eugene M. Warlich, Doherty, Rumble & Butler, St. Paul, Minn., Steven Lawson, Mark V. Chester, Johnson & Colmar, Chicago, Ill., Harold E. Kohn, Dianne M. Nast, Kohn, Savett, Klein & Graf, Philadelphia, Pa., John P. Ryan, McBride, Baker & Coles, Chicago, Ill., William T. Gotfryd, Pedersen & Haupt, Chicago, Ill., for defendants-appellees.

Before WOOD, Jr., CUDAHY and KANNE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Two related cases, but cases with different issues, were consolidated for this appeal, and heard on November 8, 1988. Subsequently, two members of the original panel disqualified themselves and a new panel was constituted to rehear the arguments.

## I.

### IN RE:

### FOLDING CARTON ANTITRUST LITIGATION

### APPEAL OF:

### UNITED STATES OF AMERICA.

### A. MOTION TO CHANGE TITLE AND DESIGNATION

As a preliminary matter, we address a Motion to Change Title and Designation filed by the Folding Carton Administration Committee ("Administration Committee"). On November 10, 1988, after the original oral argument in this case, the Administration Committee filed a motion that included the following:

At the direction of the District Court, the members of the Administration Committee appointed by Judges Robson and Will to assist them in the processing of this complex antitrust case (MDL 250) and to represent them in this Court and in the United States Supreme Court respectfully move that the title of this case be changed to United States, Petitioner, v. Judge Hubert L. Will, Respondent, and the case be correctly designated as a mandamus proceeding by the United States against Judge Will, seeking an order from this Court commanding him to vacate the settlement agreement which Judge Robson and he approved on March 28, 1985 and to recover the funds distributed thereafter and pursuant thereto to some 2500 class members and two law schools.

No change, however, was made in the designation or title of this case while it remained in the district court. The United States responded, in effect, that the mandamus was at least one way this court could enforce its 1984 mandate. Arguably this matter could be regarded as a mandamus action. It had been requested that Judge Will be permitted an opportunity to respond if this matter is to be treated as one calling for a writ of mandamus. Even if this case now be labelled a mandamus, or left as it is, the basic issues remain the same. Those issues have been thoroughly briefed, and fully argued twice. There is nothing further to be said on either side. Therefore, the motion is denied.

## B. BACKGROUND SUMMARY

This appeal, the second, grows out of efforts to conclude the settlement of record-breaking civil antitrust litigation involving an alleged nationwide price-fixing conspiracy among manufacturers of folding cartons in violation of the Sherman Act (15 U.S.C. §§ 1–7).[1] Those efforts generated problems. The problem still remaining, although usually not considered a problem, arises because the original antitrust settlement of about $200,000,000 produced ap-

proximately $6,000,000 in excess of known claims and costs. This extra money was designated as the Reserve Fund. The Administration Committee was appointed to make fee recommendations and to assist in handling claims. Later the Administration Committee was used to explore solutions for disposition of the funds remaining in the Reserve Fund. The Reserve Fund was to be held for potential late claims and other contingencies in accordance with the district court's order of March 6, 1980. In 1982, after a few additional late claims and expenses had been paid, the Administration Committee recommended to the district court that the balance of the Reserve Fund, still approximately $6,000,000 because of favorable interest, be used to establish a private "Antitrust Development and Research Foundation" to promote the study of complex litigation and various substantive and procedural aspects of antitrust law. Various class members and defendants objected to this idea. The objecting motions were denied, and the first appeal to this court followed.

The opinion resulting from that first appeal, *In Re Folding Carton Antitrust Litigation*, 744 F.2d 1252 (7th Cir.1984) (*Folding Carton I*), precipitated the subsequent events. Judge Cummings, then the Chief Judge, wrote the majority opinion joined by Judge Eschbach, with Judge Flaum concurring in part and dissenting in part. It is necessary to see exactly what that opinion held in order to understand this subsequent appeal.

In *Folding Carton I* this court affirmed the district court's 1983 opinion holding that neither the plaintiff class nor the settling defendants had any further claim to the Reserve Fund. Further, this court affirmed that it was appropriate for the district court to consider use of the *cy pres* doctrine to achieve an equitable disposition of the Reserve Fund. This court, however, made it clear, very clear, that it was inappropriate for the district court to utilize the Reserve Fund to establish the proposed "Antitrust Development and Research

---

**1.** The underlying litigation is fully described in the joint memorandum opinion of District

Judges Robson, now deceased, and Will, reported at 557 F.Supp. 1091 (N.D.Ill.1983).

Foundation." That proposal was described as "carrying coals to Newcastle." Numerous other organizations, governmental and nongovernmental, had already preempted the antitrust area for continuing research and study. Creation of the antitrust foundation was also found to be "a miscarriage of justice and an abuse of discretion." In lieu thereof this court "directed" that the remainder of the Reserve Fund escheat to the United States under 28 U.S.C. §§ 2041 and 2042.[2] Those sections were analyzed and it was held that the statutory terms for federal escheat had been sufficiently satisfied, at least in "spirit." It was provided, however, that any entitled late claimant could still recover from the United States after the escheat.

Judge Flaum, concurring in part and dissenting in part, fully agreed that the unclaimed portion of the Reserve Fund should not be used to fund the proposed antitrust foundation, but he disagreed that the unclaimed fund could "escheat" to the United States as provided by the majority, 744 F.2d at 1256. In his view it was traditional for unclaimed property to escheat to the states, not the United States. 744 F.2d at 1258. A petition for rehearing was denied, but an additional order was entered supplementing the opinion and reaffirming the majority's direction that the balance of the Reserve Fund escheat to the United States under 28 U.S.C. §§ 2041 and 2042. 744 F.2d at 1260. The question of whether or not "title" to the Reserve Fund by reason of the escheat would vest in the United States was specifically noted as being left unresolved lest it be considered "advisory." It was held in the supplemental order, how-

ever, that escheat in this statutory context was not used in the same sense as escheat to the states. 744 F.2d at 1260. There was no remand. Judge Flaum joined in the denial of the petition for rehearing but did not subscribe to the reasoning of the supplemental order. This court showed no interest in the ensuing *en banc* petition and denied a motion to stay the issuance of its mandate.

Thereafter some parties, including the two district judges themselves, Judges Robson and Will, filed their own certiorari petitions in the Supreme Court as well as a petition for a writ of mandamus. The grounds stated for the issuance of the mandamus writ were that the action of the appellate court contravened the sound exercise of appellate jurisdiction when this court substituted its findings and discretion for that of the district court, and further, that the interpretation of the escheat was a serious error of law. That is where this new litigation chapter begins.

## C. THE NEW SETTLEMENT

While those petitions were pending in the Supreme Court the parties began working out a settlement to dispose of the excess funds that was not in keeping with the mandate of this court. After providing for late claims, that settlement proposal provided that the funds remaining after the expiration of the deadline for late claims would be divided equally between (1) a pro rata distribution to all previously paid class members, and (2) two or more Chicago-area law schools for the purpose of funding

---

**2.** 28 U.S.C. §§ 2041 and 2042 provide as follows:

§ 2041.

All moneys paid into any court of the United States, or received by the officers thereof, in any case pending or adjudicated in such court, shall be forthwith deposited with the Treasurer of the United States or a designated depository, in the name and to the credit of such court.

This section shall not prevent the delivery of any such money to the rightful owners upon security, according to agreement of parties, under the direction of the court.

§ 2042.

No money deposited under section 2041 of this title shall be withdrawn except by order of court.

In every case in which the right to withdraw money deposited in court under section 2041 has been adjudicated or is not in dispute and such money has remained so deposited for at least five years unclaimed by the person entitled thereto, such court shall cause such money to be deposited in the Treasury in the name and to the credit of the United States. Any claimant entitled to any such money may, on petition to the court and upon notice to the United States attorney and full proof of the right thereto, obtain an order directing payment to him.

research projects involving enforcement of the antitrust laws, management of complex litigation, and assistance to needy students. The new settlement proposal provided for the solicitation and receipt of law school applications for a share of the funds.

Before that proposed settlement was constructed in final form, however, and recognizing that this court had given the Reserve Fund to the United States by statutory escheat, a directive unpopular with the district judge and the parties, the Administration Committee endeavored to determine the position of the United States Attorney's office in Chicago in regard to that interest. That office was contacted by telephone on December 17, 1984, by a member of the Committee and advised of the Committee's desire to discuss with the government some possible resolution of the litigation. This was followed the next day by a letter confirming the prior telephone conversation and enclosing copies of the opinions of this court and the district court. Later, in February 1985, the United States Attorney's office was again advised that a stipulated settlement was being discussed. Another telephone contact was made with the Chief of the Civil Division of the United States Attorney's office by another attorney for plaintiff class. That attorney forwarded to the United States Attorney's office a copy of the proposed stipulated settlement and gave notice that it would be presented to the court at a hearing set in March 1985. At that March hearing no one appeared on behalf of the United States, and consequently the hearing was continued by Judge Will. Thereafter, a plaintiff class attorney met personally with the Chief of the United States Attorney's Civil Division. The proposed settlement was discussed. It was thereafter reported by the class attorney to Judge Will that the government had no objection to the settlement. It was further reported that no one would be sent to represent the government at the continued settlement hearing to be held the following day, and no one was.[3] On that day, March

18, 1985, the new proposed settlement was approved. Thereafter the pending petitions in the Supreme Court were voluntarily dismissed by stipulation. Judges Robson and Will withdrew their certiorari and mandamus petitions.

Some remaining late claims were filed and after payment of costs and expenses approximately $3.6 million dollars still remained in the Reserve Fund. In accordance with the settlement agreement one-half was distributed pro rata to about 2,700 class members who had already received what was originally considered to be full compensation. Six Chicago law schools submitted applications for the Reserve Fund grants. Upon review of the applications, assisted by the Administration Committee, the district court directed that a $1.2 million grant be made to Loyola University in Chicago to establish a Center for Antitrust Law in the Public Interest, and also, that a $156,000 grant be made to the University of Chicago for a study of the performance of juries in complex litigation, including antitrust cases. The grant to Loyola was paid and deposited in a special account, but implementation of both grants was stayed when a *qui tam* complaint was filed by Paul Houck under the False Claims Act, 31 U.S.C. § 3729. The government also declined to intervene and prosecute the *qui tam* case.[4]

However, about two months later the government changed its mind and sought to intervene and to have the current settlement agreement vacated. At this later stage of these proceedings the United States Attorney's office joined with the Civil Division of the Department of Justice in the motion to intervene. The basis of the motion to intervene was that the settlement was contrary to the law of the case as set forth in this court's prior opinion, that the government had not technically consented to the settlement offer, and that the motion to intervene was timely as the action was taken as soon as the

---

3. These contacts with the United States Attorney's office are more fully set forth in *In Re Folding Carton Antitrust Litigation*, 687 F.Supp. 1223, 1226–27 (N.D.Ill.1988).

4. The dismissal of that case by Judge Norgle for lack of subject matter jurisdiction, now also on appeal, is considered in a separate part of this opinion.

government found that actual distribution of the fund was being made.

Judge Will denied the government's motion. He found that the United States had received seven notices of the proposed settlement and that its agent, the United States Attorney's office, had represented that the government had no objection to the settlement. The district court then considered and weighed the possible prejudice to the existing parties and to the government. This included the difficulty of trying to recoup the extra amounts that had already been distributed to class members. Prejudice was found to weigh against the government's intervention. The district court also refused to vacate the settlement on the basis of the law of the case as represented by this court's opinion, because it was not final as appeals were pending. The district court also found that the Chief of the Civil Division in the United States Attorney's office had authority to act for the government and that the federal regulations limiting a United States Attorney's settlement authority were not applicable because the government's interest in the Reserve Fund was not a "money claim." The government now appeals.

## D. DISCUSSION

The circumstances of this case call into question the power of this court and the enforcement of its judgments. Such a situation should not have arisen. We shall, however, not unnecessarily dwell on individual contributions to this situation. Our purpose is to resolve this case, taking it in the condition in which it has come back to us. That is not to suggest that district courts and parties to litigation may regard the opinions of this court as merely advisory, as counsel for the Administration Committee imprudently suggested at the first oral argument. Later he had some second thoughts about the use of that terminology. If they do so regard the mandates of this court, they shall do so at their peril. This court, in appropriate circumstances, will see to the enforcement of its judgments by all means at its disposal. Some cases, however, may be appropriately settled by the parties on a different basis even after being resolved otherwise by this court. For instance, in a situation involving an ordinary money judgment in a damage suit the parties are presumably free to settle around the award made by this court. A post-appeal settlement might, for example, be motivated by a desire to avoid the risk, expense, and delay of a petition for rehearing, grant of certiorari, or a new trial. Even in that situation, however, the opinions of this court are not merely advisory. There is in the present case a distinction which can be made. Here it was not in the true or ordinary sense the prevailing parties who purported to give the balance of the fund away, but the Comm and the district court, neither of which had any rights to the money they distributed. In the present case it is also of special concern that there was a specific direction in the opinion of this court that a certain proposed use of the fund not be carried out, and in addition an interest was specifically created under the escheat statute in the United States. Those directives cannot, in ordinary circumstances, be avoided or ignored by either the district court or by the parties through a settlement or by some other circumventing device.

The United States Attorney's office for some reason neglected its responsibilities to look out for whatever interest the United States had been given by this court, and actually consented to a settlement which took away that interest. The actions of that office remain unexplained and are labelled "error" and "regrettable" by the Department of Justice. In sharp contrast, the Civil Division of the Department of Justice responded in its customary competent and professional manner and now joined by the United States Attorney's office have done all that could reasonably be done to support the judgment of this court. In the present circumstances, however, that effort comes too late.

■ The basic question is whether the way the matter was handled by the United States Attorney's office makes any difference under the applicable government regulations governing the authority of the United States Attorneys. There is also the possibility of an estoppel. As argued by

the government no representative of the United States actually appeared in the district court to agree to the stipulated settlement, nor did anyone from that office sign the settlement stipulation. Further, none of the parties consulted with or received either written or oral authorization from a representative of the United States who actually had authority to settle a matter involving a sum in the amount at issue here. The United States Attorney did not have that authority. It would have been a better procedure for the district court to have issued an order requiring the United States Attorney to appear before the court approved a settlement which was at odds with the directive of this court and implicated a government interest. The parties could also have petitioned this court for instructions regarding the purported rejection by the United States of whatever interest had been bestowed. We must, therefore, begin by examining the structure and impact of those regulations as well as the escheat statutes, 28 U.S.C. §§ 2041 and 2042.

At the time the settlement was approved there was an estimated seven million dollars potentially at stake, although it was subsequently determined to be about six million. Whatever the actual amount may have been, those ranges far exceeded the settlement authority given by 28 C.F.R. § 0.160(a)(2), not only to a United States Attorney, but even to the Assistant Attorney General for the Civil Division in the Department of Justice under whose authority this matter falls. That limit is $750,-000.[5] The Assistant Attorney General, pursuant to 28 C.F.R. § 0.168(a), may redelegate to the United States Attorney any or all of that settlement authority.[6] At the time of this settlement the Assistant Attor-

ney General had delegated settlement authority to the United States Attorneys where the principal amount of the claim did not exceed $100,000, now increased to $200,000, but in any event well below the amount involved. It would have been well for the government regulations to have been considered in the district court, but they were not. *Brubaker v. United States*, 342 F.2d 655, 662 (7th Cir.1965).

It is not clear, however, that what was done was actually the acceptance of an offer in compromise of a claim on behalf of the United States to which the regulation would clearly apply. This court purported to create some not fully defined interest in the Reserve Fund and gave it to the United States under the statute. That interest, however, was rejected by the United States Attorney's office. It is questionable whether technically the claim involved was one for or against the United States. The applicability of that regulation in these circumstances is not without some ambiguity. In our view this issue largely depends on the nature of the interest this court purported to give or could give the United States under the escheat statute, an interest that we originally declined to define. 744 F.2d at 1260. That issue must now be faced.

In the district court the "escheat" ruling of this court, *Folding Carton I*, appears not to have been acceptable to anyone. Judge Will wrote that it was not a disposition that any of the parties had requested or desired, that it was done without a hearing or opportunity to object, and that it was causing some "confusion." *In Re Folding Carton Antitrust Litigation*, 687 F.Supp. 1223, 1225–26 (N.D.Ill.1988). Judge Will went further and described the opinion in

---

5. 28 C.F.R. § 0.160(a)(2) provides that Assistant Attorneys General of the litigating divisions may:

   Accept offers in compromise of claims on behalf of the United States in all cases in which the difference between the gross amount of the original claim and the proposed settlement does not exceed $750,000 or 10 percent of the original claim, whichever is greater.

6. 28 C.F.R. § 0.168(a) provides:

   The Assistant Attorneys General are authorized to redelegate to subordinate division officials and U.S. Attorneys any of the authority delegated by §§ 0.160, 0.162, 0.164, and 0.172, except that when a disagreement between a U.S. Attorney or other Department attorney and a client agency over the terms of a proposed settlement cannot be resolved below the Assistant Attorney General level, the settlement must be presented to the appropriate Assistant Attorney General for approval.

*Folding Carton I* as "silly." More constructive, since the opinion of this court was not on appeal in the district court, was Judge Will's consideration of the nature of the interest given by this court to the government. It was, he held, not a "true escheat." 687 F.Supp. at 1226. In that view he agreed with Judge Flaum in dissent, 744 F.2d at 1256, because as Judge Flaum explained, it could not be a true escheat and at the same time remain permanently available in the United States Treasury to pay late claimants. The majority in *Folding Carton I* also recognized that any claimant entitled to a share, even after escheat under the terms of the statute, would not be foreclosed. 744 F.2d at 1255. Only if no late claimant appeared could it as a practical matter possibly amount to a true escheat. The unclaimed five-year period provided by the statute before the escheat could take effect had almost run at the time of the opinion of this court, and has now. It would thus appear that Judge Will, the majority of the *Folding Carton I* panel of this court, and Judge Flaum all recognized that it was not a permanent transfer to the United States of unconditional title to the Reserve Fund. The United States under the statute was only a stakeholder, as unlikely as it was that there would be any more late claimants of consequence. The escheat statute merely provides a means of collecting into one place all unclaimed monies held in the registries of the many district courts, but still subject to payment to entitled claimants. That being so, it is doubtful that the settlement was actually of a claim on behalf of the United States in the usual sense, as the government had no unconditional right of ownership. If so the government regulations would be inapplicable. In any event, considering all the circumstances this appears to be a proper place to invoke an estoppel against the United States, something we are ordinarily reluctant to do. Fed.R.Civ.P. 24(a)[7] provides for intervention of right and in this case it would be the United States which claims an interest in the property. This rule, however, is of no avail to the government as it may be seen on the face of the rule that the application must be timely, and it was not. Any arguably unusual circumstances that might excuse that delay are outweighed by the same factors considered in our estoppel consideration.

The lack of response of the United States Attorney's office was a major contribution to these difficulties, regardless of the indefensible aspects of the settlement which resulted from the efforts of the others involved. As a result an additional distribution was thereafter made to 2,700 individual claimants, and the law schools became involved.

The doctrine of equitable estoppel, as fully discussed by Judge Cudahy in *Portmann v. United States*, 674 F.2d 1155 (7th Cir.1982), has application here. Further, the United States Attorney is not just another government agency, but the legal representative of the government—the government's counsel. That office acted in such a manner as to prejudice, although in different ways, the parties, the government, and this court's original mandate. However, even apart from estoppel and the lack of a timely application to intervene under Fed.R.Civ.P. 24(a), it must also be remembered that it was this court as an original matter which invoked the escheat statute on behalf of the United States. The district court and the parties, nevertheless, lacked authority to rewrite this court's original opinion to suit themselves. In view of all the circumstances, this court holds that any interest the United States may have had under 28 U.S.C. § 2042 is extinguished for the reasons mentioned. The denial of the motion of the United

---

7. Rule 24. Intervention

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

States to intervene is affirmed. The United States is therefore not a party.

This court in *Folding Carton I* originally affirmed the district court in holding that the plaintiff class had no further right to the Reserve Fund. There was no direct order in that opinion that there be no further distribution to claimants. In the course of settlement, however, it was agreed between the parties and approved by the district court that an additional distribution be made to those claimants. That has been done. That additional distribution to class claimants in these particular circumstances is no longer a concern to this court in view of our holding that the United States has no remaining interest in the Reserve Fund, but it would be quite to the contrary if the interest given the government remained. The claimants were the victims of the conspiracy and, even if some of them are now overcompensated, their entitlement to an additional share of the Reserve Fund is not without foundation.

■ The status of the other one-half of the Reserve Fund is a different matter. This court in *Folding Carton I* explicitly held that while it was appropriate for the district court to consider the use of the *cy pres* doctrine, the creation of the proposed antitrust foundation was inappropriate, a miscarriage of justice, and an abuse of discretion. 744 F.2d at 1254–55. That was a part of the opinion that neither the parties nor the district court could avoid on their own initiative, but they tried. They attempted to do substantially the same prohibited thing by changing the form, but not the substance. The settlement agreement provided for payments from the Reserve Fund to two law schools "to fund research

projects in the area of class actions, and particularly antitrust law," to quote from Judge Will's opinion, 687 F.Supp. at 1227.

Those two law schools, however, share not the least blame for this situation, but nevertheless the abuse of the trial court's discretion in violation of the mandate of this court cannot be permitted to stand. The grants from the Reserve Fund to Loyola University and the University of Chicago, not parties to this litigation, are voided and set aside. Any monies disbursed to one or both of those schools or set aside for disbursal shall on remand forthwith be collected into the custody of the district court. Those law schools, however, shall be entitled to reasonable attorneys' fees attributable to their involvement in the application process and subsequent related events which may be paid from the Reserve Fund.

Upon remand, the *cy pres* doctrine remains an appropriate solution for the exercise of sound discretion by the district court, but the *Folding Carton I* prohibition against using the funds for antitrust purposes remains and shall not be circumvented by the parties or the district court. The two law schools, Loyola and the University of Chicago, are in no way disqualified from being the beneficiaries of some new appropriate *cy pres* use, but the district court on remand shall have discretion totally independent of what has so far transpired. It may consider entirely different and appropriate uses under the *cy pres* doctrine. This settlement resulted from a nationwide case. Therefore, it may be appropriate for the district court on remand to consider to some degree a broader nationwide use of its *cy pres* discretion.[8] However, whatever appropriate *cy pres* use may be determined

---

8. The district court, for one possible example, may care to consider the newly created Federal Judicial Center Foundation, 28 U.S.C. § 629. The Foundation was recently created by Congress for the purpose of receiving and using gifts to further the goals of the Judicial Center. The Judicial Center is an independent government agency responsible for providing education and training services to all judicial personnel, as well as research and systems development services to the courts, the Judicial Conference of the United States, and to the Congress. The work of the Judicial Center is recognized as broadly beneficial to the bar as a whole. The

Board of the Foundation is composed of three members, including the chairman, appointed by the Chief Justice of the United States, two members appointed by the President Pro Tempore of the Senate, and two members by the Speaker of the House of Representatives.

This use would come close to giving the United States back the same type of interest in the Reserve Fund that it would have held under *Folding Carton I.* Any gift to the Foundation must by statute be deposited in a separate fund in the Treasury of the United States awaiting its use by the Board.

by the district court remains fully in the discretion of the district court regardless of the two prior aborted efforts.

It is also the order of this court that no further distribution whatsoever be made to the plaintiff class or the settling defendants, by settlement or otherwise, and no further late claimants whatsoever shall be recognized. There is nothing left in this case for the parties to settle or give away.

In *Folding Carton I* it was provided that fees not be allowed for the establishment of the Foundation, 744 F.2d 1256. We assume that fee direction was followed, but on remand the district court shall determine whether that direction was in fact followed. If not, those fees shall forthwith be retrieved and returned to the Reserve Fund.

So far as fees are concerned for the subsequent period prior to this appeal, no fees are likewise to be permitted for any legal work that related to the second effort to establish an antitrust use for the Reserve Fund which is now voided. Fees, however, may be allowed for matters related to the motion of the United States to intervene, or to other matters not voided by this court. For this appeal the allowance of fees is likewise to be apportioned in some reasonable and fair fashion, on the same limiting and proscribed basis, so that no fees shall be allowed for any legal service on appeal related to the second effort to establish or defend the research projects for class actions and antitrust.

The denial of the petition by the United States to intervene is affirmed, and the case is remanded to the district court for such further proceedings as may be necessary in keeping with this opinion. Circuit Rule 36 shall apply. If the new district judge desires to appoint a new Administration Committee, retain the former Administration Committee, or proceed without any Administration Committee, that decision also shall be within the discretion of the district court.

When the district court comes to a conclusion on the remaining issues in this case, a copy of that decision shall forthwith be filed with the Clerk of this court. It will then be reviewed by this present panel for conformity with the mandate of this court, and on any other basis which may be raised by appropriate parties. To expedite that review, this court retains jurisdiction. Any related problems that arise on remand may be brought by petition to the attention of this court. The parties shall bear their respective costs.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

## II.

### PAUL HOUCK'S *QUI TAM* ACTION

Plaintiff-appellant, Paul Houck, on behalf of the United States of America ("Houck"), appeals the district court's decision to dismiss his amended complaint for lack of subject matter jurisdiction. For the reasons stated below, we affirm.

### A. FACTUAL BACKGROUND

The underlying facts relevant to this litigation are set forth in the preceding Administration Committee portion of this opinion. The settlement agreement approved by the district court after *Folding Carton I* provided that the Reserve Fund was to be distributed to late claimants and to the Administration Committee for costs of administration and attorneys' fees. All remaining funds were to be divided equally with one-half to be distributed pro rata to class member claimants and one-half to be paid to two or more Chicago-area law schools. The funds were then fully distributed to the class member claimants and to one law school before this case was filed.

Houck assisted late claimants in filing claims and recovering money from the fund. Houck brought this *qui tam* action on behalf of the United States in 1987. He alleged that the Administration Committee and its members, as well as individuals and entities to whom money was distributed, knowingly disbursed the funds in contravention of the mandate of this court.

In his amended complaint, Houck alleges that the claims submitted pursuant to the settlement order constituted false claims

under the False Claims Act, 31 U.S.C. §§ 3729–3731, that the Committee members breached their fiduciary duties, that a constructive trust should be imposed, and that the settlement order constituted fraud upon the court under Rule 60(b) of the Federal Rules of Civil Procedure. The district court dismissed Houck's complaint based on a lack of subject matter jurisdiction and Houck appeals.

## B. ANALYSIS

We review the district court's decision *de novo*, accepting as true all well-pleaded factual allegations and the reasonable inferences drawn from them. *Kush v. American States Ins. Co.*, 853 F.2d 1380, 1382 (7th Cir.1988).

The district court properly dismissed Houck's claim as a *qui tam* plaintiff under the False Claims Act ("the Act"). The purpose of the Act is to recover money taken from the government by fraud. *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551, 63 S.Ct. 379, 387, 87 L.Ed. 443 (1943). The Act provides that under certain circumstances a *"qui tam,"* or private citizen relator, may bring an action on behalf of the United States to recover funds for the treasury. 31 U.S.C. § 3730(b)(1). The Act was amended in 1986 and the amendments took effect October 27, 1986. False Claims Amendments Act of 1986, Pub.L. No. 99–562, 100 Stat. 3153 (1986); *see* S.Rep. No. 99–345, 99th Cong., 2d Sess. 35, *reprinted in* 1986 U.S. Code Cong. & Admin.News 5266, 5300.

■ The district court properly applied the post-amendment provisions of the Act in dismissing the complaint. The Administration Committee argues that the pre-amendment version of the Act should apply as a jurisdictional bar to Houck's action. The Administration Committee contends that the Settlement Order entered on March 28, 1985 was the alleged false claim upon which Houck's complaint is based. However, Houck does not contend that the settlement order itself was a false claim, but alleges that the payment of claims constituted the false claims under the Act. The district court properly found that the

claims were submitted for distribution after the amendments became effective and therefore the amended provisions are applicable. Because we find that the post-amendment version of the Act is applicable, we do not address the substantive argument of the Administration Committee with respect to the pre-amendment Act.

■ In dismissing Houck's complaint for lack of subject matter jurisdiction, the district court relied on section 3730(e)(4)(A) of the Act which provides:

No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A). Under section 3730(e)(4)(A), a *qui tam* plaintiff may not bring an action based upon publicly disclosed allegations or transactions *unless* the plaintiff was an "original source" of the information. 31 U.S.C. § 3730(e)(4)(A). Prior to enactment, section 3730(e)(4)(A) contained a provision which permitted a *qui tam* plaintiff to bring an action based on publicly disclosed allegations and transactions if the government failed to act within six months of the disclosure. S.Rep. No. 99–345, 99th Cong., 2d Sess. 30, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5266, 5295. However, the six-month provision was deleted from the final version of the bill. Therefore, the Act in its present form does not allow a *qui tam* plaintiff to bring an action based solely on publicly disclosed transactions. The information upon which Houck based his complaint was publicly disclosed in *Folding Carton I*, 774 F.2d 1252 (7th Cir.1984). Therefore, this information cannot form the basis of an action unless Houck is an "original source."

An "original source" is defined in the Act as "an individual who has direct and independent knowledge of the information on

which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). The district court found that Houck's knowledge of the information upon which his claim was based was "direct" as a result of his involvement in assisting late claimants in recovering money out of the settlement order funds. However, Houck's knowledge of the information on which his claim is based is not "independent" within the statutory definition of "original source." There is no evidence to indicate Houck would have learned of the claims to the funds absent public disclosure. Under section 3730(e)(4)(B), an original source must have "direct *and* independent knowledge" of the information on which the complaint is based. 31 U.S.C. § 3730(e)(4)(B) (emphasis added). Therefore, under the Act the district court correctly concluded that it lacked subject matter jurisdiction because the information upon which Houck's claim is based was publicly disclosed and Houck was not an "original source" of the information.

■ Houck also seeks relief through an independent action under Rule 60(b) of the Federal Rules of Civil Procedure. The complaint alleges that the settlement order was procured through fraud upon the court based on certain representations made by an attorney for the Administration Committee. The district court concluded Houck lacked standing to maintain an independent action under Rule 60(b) because his relationship to the multi-district litigation was tenuous at best. Houck did not allege any injury to himself personally. In addition, he may not proceed on behalf of the United States as a *qui tam* plaintiff and therefore he lacks standing in a representative capacity.

The cases relied upon by Houck in asserting that his lack of standing is immaterial are not germane to his argument because they involve movants whose legal interests were affected by the judgment sought to be set aside. *See Root Refining Co. v. Universal Oil Products Co.*, 169 F.2d 514, 525 (3d Cir.1948) (quoting *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575, 580, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447 (1946)) (intervention to set aside judgment for fraud warranted as to those affected by outcome), *cert. denied sub nom. Universal Oil Products Co. v. William Whitman Co.*, 335 U.S. 912, 69 S.Ct. 481, 93 L.Ed. 444 (1949); *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 239, 64 S.Ct. 997, 998, 88 L.Ed. 1250 (1944) (movant seeking to set aside allegedly fraudulent judgment was party to prior litigation in which the judgment was entered), *overruled on other grounds, Standard Oil Co. v. United States*, 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976); *Martina Theatre Corp. v. Schine Chain Theatres, Inc.*, 278 F.2d 798 (2d Cir.1960) (movant had been plaintiff in previous action against same defendant in which a stipulated settlement had been reached); *Southerland v. Irons*, 628 F.2d 978, 979 (6th Cir.1980) (social services department alleged fraud upon the court in independent action based on attorney's representation that department's lien would be paid out of settlement proceeds and subsequently was not paid).

A nonparty who seeks to attack a fraudulently obtained judgment through an independent action is required to show that his legal interests are affected. 7 *Moore's Federal Practice* ¶ 60.36 (2d ed. 1987). In *Kem Mfg. Corp. v. Wilder*, 817 F.2d 1517, 1521 (11th Cir.1987), the Eleventh Circuit held that a nonparty must have standing under Rule 60(b) even if fraud upon the court is the basis of the motion. Although Houck was involved in assisting late claimants, he does not bring this action on his own behalf but on behalf of the United States. We therefore affirm the district court's decision that Houck lacked standing to bring an independent action under Rule 60(b).

■ The two remaining claims advanced by Houck allege breach of fiduciary duty and imposition of a constructive trust. The district court properly dismissed those claims based on lack of subject matter jurisdiction. State law claims will not be adjudicated in federal court under the doctrine of pendent jurisdiction without a compelling reason, generally when the federal

claim presents a triable issue. *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.,* 781 F.2d 604 (7th Cir.1986). Because of the lack of jurisdiction over Houck's proposed federal claims, the district court properly relinquished jurisdiction of the state law claims.[9]

We have held in the first part of this opinion that no interest in the Reserve Fund remains in the United States. There is therefore no action which can be taken on behalf of the United States. The Administration Committee shall be entitled to reasonable attorneys' fees from the Reserve Fund for the defense of this case. The parties shall bear their own costs.

We have affirmed that the United States was properly denied the right to intervene as a party, and that the claim of the *qui tam* plaintiff was properly dismissed for lack of jurisdiction. From that point the mandate of this court shall be carried out as set forth in this opinion. *Cascade Nat. Gas v. El Paso Nat. Gas,* 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967).[10]

AFFIRMED.

---

9. Because we lack subject matter jurisdiction we do not address the issue of immunity of the Administration Committee raised by appellees. The district court's denial of appellees' motion for attorneys' fees under the Act was not raised on appeal and therefore we do not address that issue.

10. *See also: United States v. E.I. DuPont de Nemours and Co.,* 366 U.S. 316, 325, 81 S.Ct. 1243, 1249; *Continental Ins. Co. v. United States,* 259 U.S. 156, 165–66, 42 S.Ct. 540, 543, 66 L.Ed. 871 (1922).